**Violet M. MORRIS, individually and as natural guardian and next friend of her children, Joyce Lynne and Burel Gene Morris II, Appellant, (Plaintiff),**

v.

**Marshall E. SMITH and John Dunder, Appellees, (Defendants).**

**No. 91–174.**

Supreme Court of Wyoming.

Sept. 9, 1992.

James E. Fitzgerald, Sharon A. Fitzgerald, and A.G. McClintock of Fitzgerald Law Offices, and Robert B. Carroll, Cheyenne, for appellant.

Rebecca A. Lewis of Hirst & Applegate, P.C., Cheyenne, for appellees.

Before MACY, C.J., and THOMAS, CARDINE and GOLDEN, JJ., and TAYLOR, District Judge.

GOLDEN, Justice.

In this appeal we consider the issue of culpable negligence of Marshall Smith and John Dunder, employees of Cheyenne Steam Laundry, in regard to injuries received by co-employee Violet Morris from handling perchloroethylene, a chemical used in the dry cleaning industry. Morris appeals the trial court's grant of summary judgment for both appellees.

We uphold the grant of summary judgment for Smith and reverse the trial court's ruling for Dunder, finding his affidavit in contradiction with his deposed testimony creates genuine issues of material fact precluding summary judgment.

## ISSUES

Appellant states the issue as:

Was summary judgment erroneously granted to two experienced dry cleaning supervisors who knew the hazards of a dangerous dry cleaning chemical, failed to train an inexperienced worker to safely handle the chemical, and instituted work practices that exposed her to it?

Appellees present the issue as:

Was summary judgment appropriately rendered in favor of defendants Smith and Dunder on the ground that there was no triable issue of material fact as to culpable negligence?

## FACTS

Violet Morris began her employment with Cheyenne Steam Laundry (Laundry) in the spring of 1986. Morris was interviewed by Marshall Smith, the president of Cheyenne Steam Laundry from 1972 until August 14, 1986, and John Dunder, the plant supervisor from 1983 to 1988. Her initial duties were as a marker/assembler, checking clothes in and out and attaching invoices, work similar to what Morris had previously experienced at a dry cleaning establishment in Nebraska in the late 1960's.

Several weeks after Morris began her employment, Linda Rivera, in the dry cleaning department, informed her that "John [Dunder] again told her that I needed to learn the process of doing silks." Morris began to dry clean silk clothing using a machine known as a "Multimatic." This machine used perchloroethylene (perc) [1] as a cleaning fluid in a "dry to dry" process in which clothing passed through five cycles: wash, drain, extract, reclaim and deodorize. Rivera instructed Morris to interrupt the normal cycle of the Multimatic in order to prevent silk fabrics from streaking. She was to remove the clothes from the Multimatic before the extraction cycle began, when the clothes were wet with perc, and place them in a dryer.

Morris claims she was exposed to perc fumes throughout the time she worked at the laundry. Before she began working on the Multimatic, she performed her work as marker/assembler in a location next to the dry cleaning operation. At that location she claimed she experienced a sore throat, headaches, and burning eyes due to the perc fumes. On occasion the perc spilled on the floor. When she began performing the additional task of dry cleaning silks using the Multimatic, her exposure to perc increased.

On December 5, 1986, Morris, hurrying to interrupt the cycle, took a deep breath as she reached into the machine to remove the clothes. Morris reported that inhalation of the perc fumes affected her nose, throat and chest, burning and choking her, making her dizzy and causing her to cough. This was the last day she worked for the laundry. Morris experienced difficulty breathing and, two days later, was admitted to the hospital for several days and treated with inhalers and steroids. Her breathing difficulties continued, requiring hospitalization again in February, 1987, with a final diagnosis of obstructive airway disease. Morris has difficulty breathing in cold or windy weather; on the advice of her physician, she moved to a lower altitude and warmer climate. Her condition is not

---

1. Perc is the principal solvent of the dry cleaning industry. The chemical has been extensively and successfully used over a long period of time although hazards may exist from inhalation, including unconsciousness or death.

expected to significantly improve, and she will be limited to the minimal activities of everyday living.

Exposure to perc occurred often in the Laundry. There were times when the dry cleaning equipment broke, spilling perc across the floor. The laundry smelled of perc. Headaches were common among the laundry employees, and Morris also experienced sore throats and burning eyes. Though Morris neither complained to Dunder or Smith nor asked about any dangers associated with perc, affidavits of other employees attest that they did complain.

Dunder stated in his deposition that he knew at the time of Morris' employment that exposure to perc could make one's lungs burn and cause lung damage, and he would sometimes tell new employees not to breath it. His later affidavit contradicts this statement. Smith knew that if mishandled, perc is a dangerous chemical whose vapors could cause dizziness, can be poisonous or cause death if ingested and can dry out skin. No written policies or procedures existed for handling spills or leaks of "perc" in the Laundry. No respiratory equipment, masks, gloves or safety equipment of any kind were available to Morris in her work nor was she trained with any specific protective gear. Fliers, trade magazines and Material Safety Data Sheets (MSDS) were sent to the Laundry to provide information on problems associated with dry cleaning. According to Smith, written documentation about the dangers of perc would have been distributed to Morris, in her training as a machine operator, by her immediate supervisor, in this case Linda Rivera, and John Dunder, the plant manager. However, no records were kept to document whether written materials were distributed and received by employees at the Laundry. Smith stated that a warning statement about the dangers of perc would have been on the Multimatic machine that Morris was operating.

Smith stated Morris was not hired to operate equipment but that her primary function was to be a marker/assembler and to his knowledge that is all she did during the time he was employed at the Laundry.

Dunder stated that he did not recall giving Morris instructions to do anything other than work as a marker/assembler and presser though he did "see her working with perc or with loading and unloading the machine."

On March 30, 1990, Morris filed her fifth amended complaint bringing suit individually and as natural guardian and next friend of her children, Joyce Lynne and Burel Gene Morris II, against Smith and Dunder under theories of culpable negligence, and against product manufacturer Vulcan Materials Company and Vulcan Chemicals and distributors Katzson Brothers, Inc., Thorson Chemical Corporation, and R.R. Street & Co., Inc., in negligence and strict liability. Appellees Smith and Dunder filed a motion for summary judgment which was granted on December 6, 1990. Vulcan Materials, Vulcan Chemicals, Katzson and Street, by stipulation of the parties, were dismissed with prejudice from the suit. Thorson was voluntarily dismissed by plaintiffs as a defendant. Vulcan, Katzson and Street settled the claim brought on behalf of Morris' son. Appellant now appeals the district court's final order of July 2, 1991, adjudicating all claims and rights and liabilities of all parties, specifically the grant of summary judgment to Smith and Dunder.

## DISCUSSION

*Standard of Review*

This court's standard for reviewing a grant of summary judgment is well known and established in regard to its application in co-employee culpable negligence litigation. *Calkins v. Boydston*, 796 P.2d 452, 454 (Wyo.1990); *Brebaugh v. Hales*, 788 P.2d 1128, 1136, n. 7 (Wyo.1990). We will "examine the record in the light most favorable to the nonmoving party, granting him all favorable inferences which can properly be drawn from the evidence." *Case v. Goss*, 776 P.2d 188, 191 (Wyo.1989) (citing *Wessel v. Mapco, Inc.*, 752 P.2d 1363, 1367 (Wyo.1988)).

*Application of Wyo.Stat. § 27–12–103(a) (1983)*

Appellant's claim is for injuries occurring in 1986. We must apply the law in effect at the time of appellant's injury:

The rights and remedies provided in this act [§§ 27–12–101 through 27–12–804] for an employee and his dependents for injuries incurred in extrahazardous employments are in lieu of all other rights and remedies against any employer making contributions required by this act, or his employees acting within the scope of their employment *unless the employees are culpably negligent,* but do not supersede any rights and remedies available to an employee and his dependents against any other person.

Wyo.Stat. § 27–12–103(a) (1983) [2] (emphasis added).

This court's prior interpretation of culpable negligence goes beyond mere negligence and ordinary lack of due care. *Cockburn v. Terra Resources, Inc.,* 794 P.2d 1334, 1343 (Wyo.1990). We have defined culpable negligence in these situations as "willful and serious misconduct." *Cockburn,* 794 P.2d at 1343; *Brebaugh,* 788 P.2d at 1136; *Case,* 776 P.2d at 191; *Poulos v. HPC, Inc.,* 765 P.2d 364, 366 (Wyo. 1988) (quoting *Barnette v. Doyle,* 622 P.2d 1349, 1362 (Wyo.1981)). "In the context of this definition, 'willful' means conduct that 'is done purposely, with knowledge—or misconduct of such a character as to evince a reckless disregard of consequences.'" *Cockburn,* 794 P.2d at 1343.

The actor's state of mind becomes the distinguishing factor that separates willful misconduct from ordinary negligence. Demonstration of actual intent is not required, but a showing that the actor's state of mind approached intent to do harm is sufficient. *Cockburn,* 794 P.2d at 1343. "Willful misconduct has to be 'more than mere mistake resulting from inexperience, excitement or confusion, and more than mere thoughtlessness or inadventure, or simple inattention.'" *Cockburn,* 794 P.2d at 1343 (quoting *Danculovich v. Brown,* 593 P.2d 187, 191 (Wyo.1979)). Because state of mind is difficult to prove, we have found willful misconduct through the demonstration that an actor "has intentionally committed an act of unreasonable charac-

ter in disregard of a known or obvious risk that is so great as to make it highly probable that harm will follow." *Cockburn,* 794 P.2d at 1343 (quoting *Bryant v. Hornbuckle,* 728 P.2d 1132, 1136 (Wyo.1986)). With this understanding of the showing needed to establish culpable negligence, we acknowledge that:

> [W]hen willfulness of an actor's conduct is questioned, courts should be reluctant to grant summary judgment because the actor's credibility is often a central issue in such cases. If the evidence presented, however, does not raise sufficient doubt of an [actor's] credibility, a party's desire to test his statements by a jury will not preclude summary judgment.

*Brebaugh,* 788 P.2d at 1136 (quoting *Bryant,* 728 P.2d at 1137).

These principles have been applied in numerous cases, providing a framework by which to analyze the current facts as they relate to claims against appellees Smith and Dunder. *See, Brebaugh,* 788 P.2d at 1136.

### Claims against Smith

Appellant relies on *Case v. Goss* to support her claim that summary judgment was improper in this instance. In that case, appellant was permanently injured after slipping on a hidden grease spot. Appellant had previously complained of the unsafe condition to the safety coordinator and other co-employees, and we reversed summary judgment as to those who had knowledge of the unsafe conditions.

Smith, as chief executive officer, was responsible for the management and supervision of the Cheyenne Steam Laundry. It is undisputed that Smith knew perc was a dangerous chemical and purchase of the Multimatic machine was an "acknowledgment or knowledge within the industry that perc was much more dangerous to handle and that there were requirements to meet certain levels of emission." He stated he was not responsible for employee safety at the Laundry; when the Laundry was cited

**2.** Sections 27–12–101 through 27–12–805 were repealed and recreated as §§ 27–14–101 through 27–14–804 by 1986 Wyo.Sess. Laws, ch. 3, § 3, effective July 1, 1987.

for OSHA violations, he instructed the plant supervisor to inform employees about hazardous materials. Smith was aware of the amount of perc permitted in the atmosphere to meet acceptable standards, but the Laundry did not have a formal measuring device to gauge the amount of perc emitted in the plant. Smith stated that he did not know what level of perc in the atmosphere would cause death, lightheadedness, eye or nose irritation, dizziness or could be detected by smell nor did he know of other symptoms indicating an overdose of perc.

In *Poulos,* we reversed summary judgment for an employee acting as an on-site supervisor of the deceased who had himself entered the tanks containing highly dangerous fumes and became aware of their dangerous nature. *Poulos,* 765 P.2d at 367. We reasoned that a jury could find a "known or obvious risk presenting a high probability of harm." *Id.*

■ Comparing these facts to *Poulos,* we find that Smith had not engaged in the same procedure that was the apparent cause of appellant's injury, though he had previously inhaled perc in a confined space. Smith was not present at the plant when appellant's injury occurred on December 5, 1986; indeed, he was not even employed by the Laundry at that time. Though he may have been aware of the *possibility* of harm from perc, the evidence does not suggest that he knew the *degree of danger* presented to appellant by operating the Multimatic machine nor did he know that appellant was doing anything other than what she had been hired to do, the job of a marker/assembler. As in *Poulos,* we find that though OSHA violations may be evidence of ordinary negligence, "they do not demonstrate a state of mind consistent with culpable negligence, which requires knowledge or obviousness of a *high probability* of harm." *Poulos,* 765 P.2d at 366.

As in *Case,* Smith did not have direct supervisory control over appellant, but had only a "general duty to supervise and maintain a safe workplace." *Case,* 776 P.2d at 194. Smith did not possess the state of mind required to show culpable negligence, that approaching intent to do harm.

There is no evidence that Smith knew that perc, in the way it was used at the Laundry, could cause injury to appellant nor did he know that the Multimatic machine's cycle was being interrupted and clothes wet with perc removed to the dryer.

We find that our discussion in *Calkins* is appropriate here:

> If appellant in this case is to avoid a summary judgment, he must come forth with evidence that [appellees] had actual knowledge that the pump was unguarded and that their failure to provide a guard was done willfully. It is not sufficient for appellant to show that the [appellees'] failure to maintain the pump in a safe condition was careless, inadvertent or an error in judgment. *Barnette,* 622 P.2d 1349 [1981]. It is not sufficient for appellant to show that in failing to place a guard on the drive shaft the [appellees] violated OSHA regulations, breached a duty to provide a safe workplace or acted ineffectually or unreasonably. *See Poulos,* 765 P.2d at 365 [Wyo.1988]; *Stephenson* [v. *Pacific Power & Light Co.* ], 779 P.2d 1169 [Wyo.1989]; and *Baros,* [v. *Wells* ], 780 P.2d 341 [Wyo.1989]. The case law is clear that appellant must show that the [appellees] *knew of the risk of harm or that the risk was obvious and yet they willfully disregarded the risk.* The evidence in the record fails to make such a showing.

*Calkins,* 796 P.2d at 456 (emphasis added).

Following our reasoning in *Calkins,* we do not find evidence to show that the risk of harm to appellant was obvious, or that Smith willfully disregarded this risk. Though Smith may have been aware generally of the possibility of harm, there is no evidence that he was aware of the degree of danger presented by using the Multimatic in the manner employed by appellant, that the Multimatic was being used in that fashion, or that appellant was operating it. *Calkins,* 796 P.2d at 456. We affirm the trial court's grant of summary judgment for Smith.

*Claims against Dunder*

As with claims against Smith, the material facts at issue are related to Dunder's knowledge of the degree of danger associated with appellant's handling of perc. We have said:

A material fact is one which, if proved, would have the effect of establishing or refuting an essential element of the cause of action or defense asserted by the parties.

*McDonald v. Mobil Coal Producing, Inc.,* 789 P.2d 866, 869 (Wyo.1990).

In this instance, evidence supporting genuine issues of material fact would show Dunder knew both that perc was a dangerous substance and that appellant was handling perc in a manner that would increase her exposure to this chemical.

In reviewing a grant of summary judgment, this court "must review the entire record in order to determine whether summary judgment was proper." *O'Donnell v. City of Casper,* 696 P.2d 1278, 1280 (Wyo. 1985). Contradictory evidence between the parties exists concerning the extent of Dunder's knowledge. Dunder's affidavit filed in support of his motion for summary judgment conflicts with his deposition testimony and affidavits of employees of the Laundry.

Dunder was the plant manager at Cheyenne Steam Laundry at the time of appellant's injury; he considered himself to be part of the management team. In his deposition, Dunder stated he knew perc could cause irritation to the nose, throat and skin, cause headaches, slurred speech, drowsiness, lightheadedness, incoordination, nausea, mental confusion, unconsciousness, stomach problems, lung damage and death.

Dunder testified in his deposition:

Q. Okay. Did you have any concern for your own safety while being around perc?

A. Yes, but I handled the perc in what I felt was a manner that I was not going to cause myself a health problem.

Q. What was your concern that caused you to so handle the perc?

A. You take one breath of perc, you can feel it kind of burn your lungs. You don't want that again, you are very careful. One time is enough.

Contradicting this earlier deposition testimony, Dunder's affidavit contains his statement that he did not know perc could cause lung damage.

Employees claimed they specifically complained to Dunder about headaches and nose bleeds they believed to have been caused by their constant exposure to perc. Conflicting with the employees' testimony, Dunder's affidavit claims he never received complaints from employees regarding ailments from exposure to perc.

Morris testified that she was informed through Linda Rivera that Dunder wanted her to "learn the process of doing silks" which she did, thereby increasing her exposure to perc through the altered method used to operate the Multimatic machine. Though Dunder denies giving Morris specific instructions to do anything other than tasks associated with marking, assembling and pressing, he admits seeing Morris "working with perc or with loading and unloading the machine."

In an apparent effort to bolster the evidence in support of the motion for summary judgment, Dunder makes conflicting statements in his affidavit of facts material to the issue of culpable negligence. The result is to create genuine issues of material fact which preclude the grant of summary judgment.

■ In the context of the existence *vel non* of a genuine issue of material fact, a number of courts have addressed the issue concerning the effect of a conflict between a party's affidavit and that party's earlier deposition testimony. The issue has ordinarily arisen when the non-movant, typically the plaintiff, submits his affidavit in an effort to oppose a summary judgment motion based, in whole or in part, on the non-movant's earlier deposition testimony. *Franks v. Nimmo,* 796 F.2d 1230 (10th Cir.1986); *Camfield Tires, Inc. v. Michelin Tire Corp.,* 719 F.2d 1361 (8th Cir.1983); *Kennett–Murray Corp. v. Bone,* 622 F.2d 887 (5th Cir.1980); *Maddy v. Vulcan Mate-*

*rials Co.*, 737 F.Supp. 1528 (D.Kan.1990). The main concern of the courts faced with such an issue has been "that parties not thwart the purpose of Rule 56 by generating issues of fact through affidavits that contradict their own depositions." *Camfield*, 719 F.2d at 1364.

In assessing the effect of a contradiction thus created, the courts have considered several factors to determine whether the submission of an affidavit constitutes an attempt to create a sham fact issue. These factors are

> whether the affiant was cross-examined during his earlier testimony, whether the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence, and whether the earlier testimony reflects confusion which the affidavit attempts to explain.

*Franks*, 796 F.2d at 1237. If a court determines that the conflict between the affidavit and the earlier testimony raises only a sham issue of fact, the court is free to disregard the contrary affidavit for summary judgment purposes. *Id.*

██ In the case at bar, we have a variation on a theme in which Dunder, as the movant, is attempting to show that no genuine issue of material fact exists through submission of a conflicting affidavit to negate his own prior sworn deposition testimony. "[T]hese conflicts present questions of credibility which require jury resolution." *Kennett–Murray*, 622 F.2d at 895. Just as courts must be cautious not to permit a non-movant to create a sham fact issue through submission of conflicting testimony, so too must courts guard against a movant's attempt to negate the existence of a genuine issue of material fact through submission of conflicting testimony.

In assessing the effect of the conflict thus created by a movant, we have considered the same factors which courts have considered in assessing the conflict created by a non-movant. Dunder was cross-examined during his earlier deposition testimony. Dunder does not claim that inconsistencies in his affidavit explain aspects of his deposition testimony or that the deposition testimony reflects confusion that requires explanation by the affidavit. *Camfield*, 719 F.2d at 1365; *Maddy*, 737 F.Supp. at 1532. In fact, Dunder filed an amendment to his deposition in which he listed twenty-nine corrections to his testimony, none of which contained the contradicting information found in his affidavit. The affidavit makes no reference to his deposition. *Maddy*, at 1532.

We hold that Dunder's affidavit, void of explanation of any confusing deposition testimony, is nothing more than an attempt to nullify apparent issues of material fact. Summary judgment for Dunder is reversed.

### CONCLUSION

We hold that summary judgment was properly granted for appellee Smith and affirm the trial court's decision. Genuine issues of material fact exist concerning Dunder's knowledge as it relates to the burden to be met in demonstrating culpable negligence. We therefore reverse the grant of summary judgment as to appellee Dunder.