# IN THE SUPREME COURT, STATE OF WYOMING

## 2025 WY 121

### OCTOBER TERM, A.D. 2025

### November 6, 2025

SCOTT DREWRY,

Appellant
(Plaintiff),

v.

WILLIAM BRENNER, individually,
and in his official capacity as Chief of
Police; and the TOWN OF
GREYBULL,

Appellees
(Defendants).

S-24-0272

*Appeal from the District Court of Big Horn County*
*The Honorable Bill Simpson, Judge*

*Representing Appellant:*
> Philip E. Abromats and Letitia C. Abromats, Greybull, Wyoming. Argument by Mr. Abromats.

*Representing the Town of Greybull and William Brenner in his Official Capacity:*
> John D. Bowers, Bowers Law Firm, PC, Afton, Wyoming. Argument by Mr. Bowers.

*Representing William Brenner:*
> Bridget Hill, Attorney General, Mark A. Klaassen, Deputy Attorney General, Debra Hulett, Senior Assistant Attorney General. Argument by Ms. Hulett.

*Before BOOMGAARDEN, C.J., and GRAY, FENN, and JAROSH, JJ., and MCGRADY, D.J.*

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**BOOMGAARDEN, Chief Justice.**

[¶1]    Scott Drewry sued the Town of Greybull and William Brenner, Chief of the Greybull Police Department (Greybull PD)[1] after Chief Brenner issued a memorandum to Greybull PD's officers and several city and county officials. The memorandum created a new policy and outlined concerns Chief Brenner had with Mr. Drewry based on Mr. Drewry's former employment with Greybull PD. Mr. Drewry brought claims for breach of a settlement agreement made between Mr. Drewry and the Town when he left Greybull PD, as well as for intentional infliction of emotional distress and defamation per se. The district court granted summary judgment to Chief Brenner and the Town. We affirm in part, reverse in part, and remand for further proceedings.

## *ISSUES*

[¶2]    We restate, reorder, and consolidate the issues as follows:

> 1. Does qualified immunity preclude Mr. Drewry's defamation per se and intentional infliction of emotional distress claims?

> 2. Are there genuine issues of material fact preventing summary judgment on Mr. Drewry's breach of contract claim?

---

[1] The caption in this case presents the appellees as Chief Brenner, in both his individual and official capacities, and the Town of Greybull. This designation of the defendants is atypical in cases under the Wyoming Governmental Claims Act, *e.g.*, *Uinta Cnty. v. Pennington*, 2012 WY 129, 286 P.3d 138 (Wyo. 2012) (captioning the appellants as "UINTA COUNTY, WYOMING; UINTA COUNTY SHERIFF LOUIS NAPOLI; and BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF UINTA"), and appears to borrow from the terminology used in federal cases under 42 U.S.C. § 1983, where claims against an officer in his personal capacity seek to impose liability on the officer personally, and claims against an officer in his official capacity seek to impose liability on the governmental entity. *See Hafer v. Melo*, 502 U.S. 21, 25, 112 S.Ct. 358, 361–62, 116 L.Ed.2d 301 (1991). We will refer to Chief Brenner "in his individual capacity" as "Chief Brenner," and to Chief Brenner "in his official capacity" and the Town collectively as "the Town."

*FACTS*

[¶3]    In 2016, Mr. Drewry was living in California and applied for an open position as a police sergeant with Greybull PD. His resume reflected that he had a "Bachelor of Arts (Business Admin)" from Hawaii-Pacific University. Mr. Drewry did not have such a degree and did not attend Hawaii-Pacific University. Chief Brenner did not discover this misrepresentation until he had extended Mr. Drewry a conditional job offer. Nonetheless, Chief Brenner moved forward with hiring Mr. Drewry.

[¶4]    In 2017, Chief Brenner heard a rumor from a Greybull PD officer that Mr. Drewry was having an extramarital affair with a local woman. Mr. Drewry denied the rumor and Chief Brenner did not look into the matter further. In 2018, the Greybull Town administrator informed Chief Brenner that he had heard similar rumors, and Chief Brenner became concerned about misuse of Greybull PD time and resources relating to Mr. Drewry spending time with the woman. Chief Brenner opened an internal investigation. Chief Brenner was not able to confirm Mr. Drewry and the woman were romantically involved, but Mr. Drewry did admit to going to her house while on shift without calling out his location, as well as having her accompany him on several out-of-town training trips paid for by Greybull PD. Greybull PD suspended Mr. Drewry for two days.

[¶5]    In 2021, Mr. Drewry helped a Big Horn County Sheriff's deputy investigate a single vehicle crash. The driver was suspected of driving under the influence and was taken to a nearby hospital. After Mr. Drewry secured the scene, another deputy called him and requested that he bring a blood draw kit to the hospital. The driver refused to consent to a blood draw. Mr. Drewry suggested that they could have the hospital draw the blood and hold it until they could obtain a search warrant. The deputy believed the crash occurred within Greybull PD's jurisdiction and requested Mr. Drewry take over the investigation. Mr. Drewry agreed, and again attempted to get the driver to consent to a blood draw. When the driver refused, Mr. Drewry asked the attending nurse if he would draw the blood and store it in the hospital's "secure medicine refrigerator" until he could obtain a warrant. The nurse drew the blood and Mr. Drewry labeled the vials, signed them, and left them with the nurse.

[¶6]    Mr. Drewry then ended his shift and went home at 6:00 a.m. After beginning his next shift at 1:00 p.m., Mr. Drewry completed an affidavit for a search warrant to seize "biological fluid" located "on the person of" the driver. A circuit court judge issued the warrant. Mr. Drewry signed a warrant return stating he had seized the blood after the judge issued the warrant.

[¶7]    Several months later, the county attorney contacted Chief Brenner and informed him of "some discrepancies" she noticed in the criminal case against the driver of the vehicle.

2

She was concerned that the blood appeared to have been drawn earlier than Mr. Drewry had indicated he seized it. Chief Brenner opened an internal investigation. As part of the investigation, Mr. Drewry provided a written narrative and confirmed he had the hospital draw and hold the blood prior to obtaining a warrant. Mr. Drewry explained that he believed the procedure to be lawful, and had previously instructed other officers that this process was appropriate at a meeting Chief Brenner attended.

[¶8]    After looking into the matter and meeting with Town officials, Chief Brenner told Mr. Drewry that he would be terminated from Greybull PD. Chief Brenner offered Mr. Drewry the option to resign, but Mr. Drewry declined and told Chief Brenner he planned to appeal the termination. Mr. Drewry then returned his department-issued cell phone to Chief Brenner and explained he had "wiped" it due to personal information he had on the phone. Chief Brenner reviewed phone company records, and after extracting data from the phone he discovered evidence that further suggested a relationship between Mr. Drewry and the woman who was the subject of the affair rumors.

[¶9]    Mr. Drewry and Greybull PD eventually executed a settlement agreement lifting Mr. Drewry's termination and allowing Mr. Drewry to resign from Greybull PD. In relevant part, the agreement stated: "Chief Brenner and the Town Council, in both their professional and personal capacities, shall not demean, disparage, defame or otherwise talk negatively in any way about Mr. Drewry regarding the investigation, termination or resignation." (the non-disparagement clause).

[¶10]   After leaving Greybull PD, Mr. Drewry worked as an officer for the Lovell Police Department. He later accepted a position with the Basin Police Department. When Chief Brenner heard Mr. Drewry had been offered a job in Basin, he issued the following memorandum (the Brenner memo):

> To: Greybull Officers
>
> From: Chief Bill Brenner
>
> CC: Administrator Hunt, City Attorney Kent Richins, County Attorney Marcia Bean
>
> Date: 07/14/2022
>
> Re: Scott Drewry

Greetings,

It has been brought to my attention that Former Greybull Police Officer Scott Drewry has been offered employment by the Basin Police Department. Because of the close proximity to Greybull I felt that this may be an issue for our agency given the fact that we back-up officers in Basin, and they perform back-up for our agency when needed.

Because of Mr. Drewry's history of deception with our department, he will not participate in any investigations conducted by the Greybull Police Department, nor assist with any investigations within our community if called for back-up given the fact that he would not be considered a credible witness, and may jeopardize any case that he is involved in. Once your scene is secure and safe, Mr. Drewry will be dismissed from the scene. When the Greybull Police Department is requested to provide back-up for the Basin Police Department, it will be limited to security of the scene and officer safety. Once the scene is secure, the officer will return to Greybull immediately.

For those of you who are not aware of Brady v. Maryland Supreme Court Decision 1963 see below:

> Police officers who have been dishonest are sometimes referred to as "Brady cops." Because of the Brady ruling, prosecutors are required to notify defendants and their attorneys whenever a law enforcement official involved in their case has a sustained record for knowingly lying in an official capacity.

If you have any questions regarding this matter, please see me.

Thank you,

[signed]

4

Chief Bill Brenner

[¶11] Mr. Drewry and his wife sued Chief Brenner and the Town, claiming that the Brenner memo violated the non-disparagement clause in the settlement agreement. They also brought defamation per se and intentional infliction of emotional distress claims.[2]

[¶12] Chief Brenner and the Town each moved for summary judgment on all of the remaining claims. The district court granted the motions. It interpreted the settlement agreement and concluded that "the investigation" referenced in the non-disparagement clause meant only the inquiry into the blood draw incident. The court noted the Brenner memo did not expressly mention the investigation, termination, or resignation, but concluded "it would be elevating form over substance to say that the memo was not directed, at least in part, to the investigation into the blood draw when it discusses Mr. Drewry's history of deception." However, the court determined the undisputed evidence showed Mr. Drewry had a history of deception, and Chief Brenner had a duty to disclose any impeachment issues under *Brady*, which was allowed under a settlement agreement provision stating that the agreement did not relieve the parties of any duties otherwise imposed by law.

[¶13] The district court also granted summary judgment on the intentional infliction of emotional distress claim, concluding there was not sufficient evidence of extreme and outrageous conduct on Chief Brenner's part to create a genuine issue of material fact. As for the defamation claim, the district court found that the Brenner memo was truthful, and that it was conditionally privileged. Finally, the district court concluded Chief Brenner was entitled to qualified immunity, and he and the Town were entitled to summary judgment on the intentional infliction of emotional distress and defamation claims on that basis as well. Mr. Drewry timely appealed.

## STANDARD OF REVIEW

[¶14] A party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." W.R.C.P. 56(a). We review a district court's decision to grant summary judgment

---

[2] Mr. Drewry's wife also claimed loss of consortium, and Mr. Drewry and his wife sought punitive damages. The district court dismissed the loss of consortium and punitive damages claims prior to the summary judgment proceedings that are the subject of this appeal. Mr. Drewry does not contest those dismissals, and we do not discuss them further.

de novo. *Leeks Canyon Ranch, LLC v. Jackson Hole Hereford Ranch, LLC*, 2025 WY 63, ¶ 17, 569 P.3d 1120, 1126 (Wyo. 2025) (citing *Leonhardt v. Big Horn Cnty. Sheriff's Off.*, 2024 WY 128, ¶ 16, 559 P.3d 1053, 1058 (Wyo. 2024)).

> We review a summary judgment in the same light as the district court, using the same materials and following the same standards. We examine the record from the vantage point most favorable to the party opposing the motion, and we give that party the benefit of all favorable inferences that may fairly be drawn from the record.

*Leeks Canyon Ranch, LLC*, 2025 WY 63, ¶ 17, 569 P.3d at 1126–1127 (brackets and footnote omitted) (quoting *Leonhardt*, 2024 WY 128, ¶ 16, 559 P.3d at 1058).

[¶15] A summary judgment motion involves shifting burdens. The moving party bears the initial burden to make a prima facie showing that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. *Kudar v. Morgan*, 2022 WY 159, ¶ 11, 521 P.3d 988, 992 (Wyo. 2022). A moving party who does not have the ultimate burden of persuasion may establish a prima facie case for summary judgment "by showing a lack of evidence on an essential element of the opposing party's claim." *Gowdy v. Cook*, 2020 WY 3, ¶ 22, 455 P.3d 1201, 1207 (Wyo. 2020) (citing *Warwick v. Accessible Space, Inc.*, 2019 WY 89, ¶ 10, 448 P.3d 206, 211 (Wyo. 2019); *Mantle v. N. Star Energy & Constr. LLC*, 2019 WY 29, ¶ 116, 437 P.3d 758, 796 (Wyo. 2019)). If the moving party meets this initial burden, "the opposing party is obligated to respond with materials beyond the pleadings to show a genuine issue of material fact." *Kudar*, 2022 WY 159, ¶ 11, 521 P.3d at 992 (quoting *Woodward v. Valvoda*, 2021 WY 5, ¶¶ 12–13, 478 P.3d 1189, 1196 (Wyo. 2021)). "A material fact is one which, if proved, would have the effect of establishing or refuting an essential element of the cause of action or defense asserted by the parties." *Leeks Canyon Ranch, LLC*, 2025 WY 63, ¶ 17, 569 P.3d at 1126-1127 (quoting *Leonhardt*, 2024 WY 128, ¶ 16, 559 P.3d at 1058).

[¶16] We may affirm an order granting summary judgment on any basis supported by the record. *Bain v. City of Cheyenne*, 2025 WY 67, ¶ 6, 570 P.3d 725, 727 (Wyo. 2025) (citing *Sorenson v. Halling*, 2025 WY 8, ¶ 6, 561 P.3d 1241, 1244 (Wyo. 2025)).

## DISCUSSION

[¶17]   Mr. Drewry presents eight issues for our review. We begin by paring those down. Two of the issues relate to alleged analytical errors made by the district court and its view of the evidence presented by the parties. It is unnecessary for us to consider these issues given that our standard of review is de novo and our reasoning is independent from that of the district court. *See Leeks Canyon Ranch, LLC*, 2025 WY 63, ¶ 17, 569 P.3d at 1126.

[¶18]   Mr. Drewry also argues the district court improperly relied on a "sham fact affidavit" presented by Chief Brenner in which he set forth the reasons he believed Mr. Drewry had a "history of deception." *See Woodward*, 2021 WY 5, ¶ 18, 478 P.3d at 1198 ("[I]f the 'court determines that the conflict between the affidavit and the earlier testimony raises only a sham issue of fact, the court is free to disregard the contrary affidavit for summary judgment purposes.'") (quoting *Morris v. Smith*, 837 P.2d 679, 685 (Wyo. 1992)). Because we do not rely on the affidavit in affirming the district court on the tort claims or in reversing on the breach of contract claim, we need not address this issue.

[¶19]   Mr. Drewry also contends the district court should not have considered Chief Brenner's summary judgment motion because it did not contain its own statement of facts separate from the statement of facts contained in his W.R.C.P. 56.1 statement of material facts.[3] Mr. Drewry asserts that "[t]his is problematic under WRCP 56(a), under which the moving party has 'the initial burden of production on a motion for summary judgment[.]'" Because he does not elaborate on why this is problematic or how it would affect the parties' abilities to meet their respective burdens on summary judgment, we will not consider this issue. *See Vassilopoulos v. Vassilopoulos*, 2024 WY 87, ¶ 28, 557 P.3d 725, 734 ("[T]his Court does not address arguments unsupported by cogent argument or authority[].") (citing *McInerney v. Kramer*, 2023 WY 108, ¶ 14, 537 P.3d 1146, 1150 (Wyo. 2023)).

[¶20]   Finally, we address the intentional infliction of emotional distress and defamation per se claims together because we conclude qualified immunity disposes of both claims. We therefore address two dispositive issues: Chief Brenner's qualified immunity on the tort claims and the viability of Mr. Drewry's breach of contract claim.

---

[3] W.R.C.P. 56.1(a) requires a party to include with its summary judgment motion "a separate, short and concise statement of the material facts as to which the moving party contends there is no genuine issue to be tried."

7

## I. The doctrine of qualified immunity precludes Mr. Drewry's defamation per se and intentional infliction of emotional distress claims.

[¶21] "Qualified immunity developed at common law and remains available through common law even if immunity is otherwise waived under the Wyoming Governmental Claims Act." *Palm-Egle v. Briggs*, 2024 WY 31, ¶ 33, 545 P.3d 828, 838 (Wyo. 2024) (citing *Uinta Cnty. v. Pennington*, 2012 WY 129, ¶ 13, 286 P.3d 138, 142 (Wyo. 2012)). Qualified immunity applies only to tort claims against an officer, and thus cannot preclude Mr. Drewry's breach of contract claim. *See Kanzler v. Renner*, 937 P.2d 1337, 1344 (Wyo. 1997) ("Under the common law, police officers . . . . enjoy only a limited immunity from tort liability."). A determination that a peace officer is entitled to qualified immunity effectively disposes of tort claims against both the officer and the governmental entity.[4] *Darrar v. Bourke*, 910 P.2d 572, 578 (Wyo. 1996) ("If the court determines the officer is entitled to qualified immunity, then as a matter of law, the officer is not liable. If the officer is entitled to the affirmative defense of qualified immunity, the conduct of the officer is not tortious, and no vicarious liability exists on the part of the governmental entity.") (citing *DeWald v. State*, 719 P.2d 643, 655 (Wyo. 1986) (Thomas, C.J., specially concurring)); *see also Pennington*, 2012 WY 129, ¶ 27, 286 P.3d at 146 ("Based on our holding that Sheriff Napoli is entitled to qualified immunity, the ruling against the County and the Board must also be reversed.").

[¶22] Qualified immunity "is appropriate for disposition early in a case, prior to adjudication on the merits." *Palm-Egle*, 2024 WY 31, ¶ 35, 545 P.3d at 839 (citing *Wyo. State Hosp. v. Romine*, 2021 WY 47, ¶ 8, 483 P.3d 840, 844 (Wyo. 2021); *Wallace v. Dean*, 3 So.3d 1035, 1044–45 (Fla. 2009)). While it may not be an appropriate basis for dismissal at the motion to dismiss stage, it is appropriate for disposition on summary judgment if the facts have been sufficiently developed. *Palm-Egle*, 2024 WY 31, ¶ 35, 545 P.3d at 839. A peace officer is entitled to qualified immunity if he can establish four elements: "(1) the officer acted within the scope of their duties; (2) and in good faith; (3) the acts were reasonable under the circumstances; and (4) the acts were discretionary duties, not operational or ministerial." *Id.*, ¶ 33, 545 P.3d at 838–39. Mr. Drewry concedes the first and fourth elements are met in this case. We therefore address in turn whether Chief Brenner acted in good faith and whether he acted reasonably under the circumstances.

---

[4] This aspect of our qualified immunity jurisprudence is distinct from federal law under 42 U.S.C. § 1983, where "[q]ualified immunity 'is available only in suits against officials sued in their personal capacities, not in suits against governmental entities or officials sued in their official capacities.'" *Griffith v. El Paso Cnty., Colo.*, 129 F.4th 790, 820–21 (10th Cir. 2025) (quoting *Starkey ex rel. A.B. v. Boulder Cnty. Soc. Servs.*, 569 F.3d 1244, 1263 n.4 (10th Cir. 2009)); *see also Palm-Egle*, 2024 WY 31, ¶ 33 n.9, 545 P.3d at 839 n.9 (noting that aspects of Wyoming's qualified immunity doctrine are "distinct from the federal standard.").

[¶23] With regard to the good faith element, we have agreed with cases from other jurisdictions holding "that an officer asserting this affirmative defense must show that a reasonably prudent officer, under the same or similar circumstances, could have believed that his conduct was justified based on the information he possessed when the conduct occurred." *Pennington*, 2012 WY 129, ¶ 17, 286 P.3d at 143 (citing *Telthorster v. Tennell*, 92 S.W.3d 457, 460 (Tex. 2002)).

[¶24] Here, Chief Brenner explained that he prepared the Brenner memo "to inform Greybull Officers about the process Greybull Officers would use if Drewry, as an officer with the Basin Police Department, was at the scene of a Greybull police investigation, and the process that Greybull officers would use if providing back-up for the Basin Police Department." He also explained that he implemented the policy to protect the Town from risks he perceived with Mr. Drewry being involved with Greybull PD investigations. The parties do not dispute that as Chief of Greybull PD, setting and communicating policies for conducting investigations and providing backup to other departments was within Chief Brenner's discretion. Mr. Drewry counters that "numerous witnesses . . . testified that Brenner had a vendetta against Drewry, probably because Brenner thought Drewry was after his job." He also argues that Chief Brenner "published the memo out of a personal animus toward Drewry, and he negligently over-published the Memo[.]" Finally, he notes many recipients of the Brenner memo disagreed with it.

[¶25] Though several witnesses did say they disagreed with the memo and thought Chief Brenner had personal issues with Mr. Drewry, Mr. Drewry overlooks our precedent that "[w]hether a public official is entitled to qualified immunity is a question of law which the court must resolve." *Pennington*, 2012 WY 129, ¶ 16, 286 P.3d at 143 (citing *Layland v. Stevens*, 2007 WY 188, ¶ 12, 171 P.3d 1070, 1073 (Wyo. 2007)). It is precisely for this reason that we have agreed that good faith is established where an officer "***could have believed*** that his conduct was justified based on the information he possessed when the conduct occurred." *Pennington*, 2012 WY 129, ¶ 17, 286 P.3d at 143 (emphasis added) (citing *Telthorster*, 92 S.W.3d at 460). "If officers of reasonable competence could disagree on the issue, the officer will be said to have acted in good faith as a matter of law." *Pennington*, 2012 WY 129, ¶ 21, 286 P.3d at 144 (citing *Cherqui v. Westheimer St. Festival Corp.*, 116 S.W.3d 337, 351 (Tex. App. 2003)). Therefore, the fact that several witnesses believed Chief Brenner wrote the Brenner memo based on his personal issues with Mr. Drewry cannot overcome the fact that a reasonably competent officer could have viewed the memo as a good faith means of implementing a new department policy based on Chief Brenner's concerns with Mr. Drewry. We conclude Chief Brenner has established that he acted in good faith for the purposes of qualified immunity.

[¶26] Differences of opinion are similarly immaterial when applying the reasonableness element. "[R]easonableness, in the context of a qualified immunity analysis is defined 'as having the faculty of reason; rational; governed by reason; being under the influence of

reason; thinking, speaking, or acting rationally, or according to the dictates of reason; agreeable to reason; just; rational.'" *Palm-Egle*, 2024 WY 31, ¶ 37, 545 P.3d at 839 (quoting *Pennington*, 2012 WY 129, ¶ 20, 286 P.3d at 144). This qualified immunity standard is different than the reasonableness standard in a negligence analysis. *Palm-Egle*, 2024 WY 31, ¶ 37, 545 P.3d at 839. To show reasonableness, an officer need not show that all reasonably prudent officers would have acted as he did; rather, he must show that a reasonably prudent officer, acting under the same circumstances, "***might*** have reached the same decision." *Id.*, ¶ 37, 545 P.3d at 839 (emphasis added) (quoting *Pennington*, 2012 WY 129, ¶ 21, 286 P.3d at 144). Regardless of whether Chief Brenner's concerns with Mr. Drewry were potentially unjustified or based on improper motives, there was an objective basis for setting the policy based on the multiple internal investigations while Mr. Drewry was employed with Greybull PD that concluded with Mr. Drewry being disciplined. Based on the record, a reasonable officer might have implemented the same policy in light of those circumstances. We therefore conclude Chief Brenner satisfied the reasonableness prong of the qualified immunity test, and Chief Brenner and the Town were entitled to qualified immunity on Mr. Drewry's intentional infliction of emotional distress and defamation per se claims.

## II. *Genuine issues of material fact preclude summary judgment on Mr. Drewry's breach of contract claim.*

[¶27] "To prove a breach of contract, the proponent must show a lawfully enforceable contract, an unjustified failure to timely perform all or any part of what is promised therein, and entitlement of [the] injured party to damages." *Eiden Constr., LLC v. Hogan Assocs. Builders, LLC*, 2024 WY 138, ¶ 43, 561 P.3d 304, 31718 (Wyo. 2024) (internal quotation marks omitted) (quoting *Larson v. Burton Constr., Inc.*, 2018 WY 74, ¶ 15, 421 P.3d 538, 544 (Wyo. 2018)). Here, the parties do not dispute that the settlement agreement was a lawfully enforceable contract. Their disagreement is in their interpretation of the agreement's non-disparagement clause, and whether Chief Brenner breached that clause when he issued the Brenner memo.

### A. The phrase "the investigation" as used in the non-disparagement clause is ambiguous.

[¶28] We interpret a contract by focusing on the parties' intent as evidenced by the language used in the contract. *Van Vlack v. Van Vlack*, 2023 WY 104, ¶ 20, 537 P.3d 751, 757 (Wyo. 2023) (citing *Hofhine v. Hofhine*, 2014 WY 86, ¶ 9, 330 P.3d 242, 245 (Wyo. 2014)). When the terms of a contract are clear and unambiguous, we look only to the "four corners" of the agreement to interpret it. *Van Vlack*, 2023 WY 104, ¶ 20, 437 P.3d at 757.

"Whether a contract is ambiguous is a matter of law for the court to decide," and when the terms of a contract are unambiguous, the interpretation of those terms is also a matter of law. *Van Vlack*, 2023 WY 104, ¶ 20, 537 P.3d at 757 (quoting *Claman v. Popp*, 2012 WY 92, ¶¶ 26–28, 279 P.3d 1003, 1013 (Wyo. 2012)).

[¶29] However, where the terms of a contract are ambiguous, extrinsic evidence is admissible to clarify those ambiguous terms. *Kuhl v. Wells Fargo Bank, N.A.*, 2012 WY 85, ¶ 21, 281 P.3d 716, 724 (Wyo. 2012). "An ambiguous contract is an agreement which is obscure in its meaning, because of indefiniteness of expression, or because a double meaning is present." *Van Vlack*, 2023 WY 104, ¶ 20, 537 P.3d at 757 (internal quotation marks omitted) (quoting *Brockway v. Brockway*, 921 P.2d 1104, 1106 (Wyo. 1996)). Where a contract term is ambiguous, summary judgment is typically improper. *Hopkins v. Bank of the West*, 2013 WY 129, ¶ 13, 311 P.3d 151, 155 (Wyo. 2013). "In that instance, 'there exists a question of intent which the trier of fact must resolve.'" *Meima v. Broemmel*, 2005 WY 87, ¶ 71, 117 P.3d 429, 452 (Wyo. 2005) (quoting *Western Utility Contractors, Inc. v. City of Casper*, 731 P.2d 24, 28 (Wyo.1986)); *accord Van Vlack*, 2023 WY 104, ¶ 34, 537 P.3d at 760 (reversing and remanding for an evidentiary hearing "to determine the parties' original intent and enforce the [agreement] accordingly.").

[¶30] The settlement agreement's non-disparagement clause provides that Chief Brenner and the Town "shall not demean, disparage, defame or otherwise talk negatively in any way about Mr. Drewry regarding the investigation, termination or resignation." The words "demean," "disparage," and "defame" all have common definitions and would convey a plain and unambiguous meaning to reasonable persons at the time and place of the settlement agreement's execution. However, they are encompassed by the broadest phrase in the non-disparagement clause: "otherwise talk negatively in any way[.]" In the context of talking about another person, the word "negative" has relevant definitions of "adverse, unfavorable"; "lacking positive qualities"; "marked by features of hostility, withdrawal, or pessimism . . . that hinder or oppose constructive treatment or development"; and "promoting a person or cause by criticizing or attacking the competition[.]" *Negative*, Merriam-Webster, https://www.merriam-webster.com/dictionary/negative (last visited Oct. 6, 2025). The non-disparagement clause therefore prohibits a broad class of statements by Chief Brenner and the Town that are adverse, unfavorable, not positive, hostile, oppositional, critical, or attacking toward Mr. Drewry. *See id.*

[¶31] This broad prohibition, however, is limited by the non-disparagement clause itself, which prohibits negative statements only to the extent they are "regarding the investigation, termination or resignation." Mr. Drewry challenges only those statements in the Brenner memo pertaining to "the investigation." He argues "the investigation" concerned more than just the blood draw incident. He contends that Chief Brenner's post-termination investigation into Mr. Drewry's cell phone records, as well as his reference to Mr. Drewry's alleged affair in a memo he authored prior to Mr. Drewry's termination, indicate that "the

11

investigation" also pertained to the alleged affair. Chief Brenner and the Town respond that the only subject of "the investigation" was the blood draw incident.

[¶32] The phrase "the investigation" is ambiguous. No party disputes that "the investigation" referenced in the non-disparagement clause was initiated as a result of the blood draw incident. However, the scope of the investigation is unclear from the record. Before Chief Brenner terminated Mr. Drewry, he sent him a memo updating him on the process. In it, he explained that he and Town officials "discussed possible outcomes, ***and prior disciplinary actions taken since you have been employed here*** as well as reviewing video and case laws." (emphasis added) Additionally, Chief Brenner recorded the conversation where he informed Mr. Drewry of his termination. During that conversation, he explained that he and the Town council "also discussed your performance here and as far as your other—other disciplinary actions years ago, and they felt that it was unbefitting for a sergeant to be two—two times in five years of being in the hot seat, essentially." While "the investigation" was undoubtedly spurred by the blood draw incident, Chief Brenner's own statements indicate that the process that resulted in Mr. Drewry's termination also concerned Mr. Drewry's past conduct.

[¶33] The word "investigation" means "to observe or study by close examination and systematic inquiry." *Investigation*, Merriam-Webster, https://www.merriam-webster.com/dictionary/investigate. On its own, the phrase "the investigation" has a common and uncontroversial definition. Notably, however, the non-disparagement clause in the settlement agreement clearly references a specific investigation. We "may look to the surrounding circumstances, the subject matter, and the purpose of the contract to ascertain the intent of the parties at the time the [settlement] agreement was made," *N. Silo Res., LLC v. Deselms*, 2022 WY 116A, ¶ 15, 518 P.3d 1074, 1081 (Wyo. 2022) (quoting *Wadi Petroleum, Inc. v. Ultra Res., Inc.*, 2003 WY 41, ¶ 11, 65 P.3d 703, 708 (Wyo. 2003)), but doing so on this record still results in ambiguity and disputed issues of fact. It is possible that by the time Chief Brenner and the Town council considered Mr. Drewry's prior disciplinary history, "the investigation" had already concluded and the consideration of that history simply related to the appropriate disciplinary action. However, it is also possible that "the investigation" continued until Chief Brenner and the council decided to terminate Mr. Drewry. By the indefiniteness of their expression, the parties have created the possibility of a double meaning. *Van Vlack*, 2023 WY 104, ¶ 20, 537 P.3d at 757. Therefore, summary judgment on the breach of contract claim was improper. *Hopkins*, 2013 WY 129, ¶ 13, 311 P.3d at 155.

[¶34] The parties also dispute what Chief Brenner meant when he referenced Mr. Drewry's "history of deception" in the Brenner memo. Chief Brenner argues that "[n]ot one word, phrase, or sentence in the memorandum mentions the December 2021 internal investigation[.]" The Brenner memo is not a contract though, and the trier of fact is not bound by the four corners of the memo in determining its meaning. *See Van Vlack*, 2023

12

WY 104, ¶ 20, 437 P.3d at 757. Additionally, until the phrase "the investigation" is clarified, we cannot be certain what type of references in the memo would constitute a breach of the settlement agreement. The task for the trier of fact in this case will be to first determine the scope of the phrase "the investigation," and then determine whether the Brenner memo made any negative statements (express or implied) that concerned "the investigation."

**B.     Chief Brenner was not obligated by law to distribute the Brenner memo.**

[¶35]   Chief Brenner and the Town argue a separate basis to affirm summary judgment on the breach of contract claim. The settlement agreement contains the following provision:

> **Compliance with Law.** Nothing in this agreement shall be construed as relieving the Parties of the obligation to comply with all federal, state or local laws, regulations, ordinances or rules, nor shall any provisions of the Agreement be deemed to be permission to engage in any act or practice prohibited by law, regulation, or rule.

Chief Brenner and the Town contend the Chief had a duty under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) to disclose any credibility concerns regarding Mr. Drewry to the relevant prosecutors.

[¶36]   While the *Brady* obligation is an important one, Chief Brenner and the Town provide little analysis for the weighty proposition that the Chief was somehow affirmatively obligated to author and distribute the Brenner memo. They also overlook the fact that *Brady* places a duty on *the prosecutor* to disclose *material* favorable evidence to the defendant in each *individual* criminal case. 6 Wayne R. LaFave et al., *Criminal Procedure* § 24.3(b) (4th ed. November 2024 Update). Even the most liberal interpretation of *Brady* requires that the evidence in question have a "favorable relevancy" to the specific criminal case at hand. *See id.* Any proper analysis under *Brady* must therefore be done in the context of a particular criminal case. *See id.* Chief Brenner and the Town's suggestion that the Chief was obligated to prophylactically disclose Mr. Drewry's alleged credibility issues in every future hypothetical case involving Mr. Drewry is an extraordinary one, and it is not supported by their brief analyses.

## *CONCLUSION*

[¶37]  The undisputed facts in this case show that Mr. Drewry's intentional infliction of emotional distress and defamation claims are precluded by qualified immunity. We therefore affirm the district court's grant of summary judgment to Chief Brenner and the Town on both of those claims. However, the phrase "the investigation" as used in the settlement agreement is ambiguous. There are genuine issues of material fact regarding that phrase's meaning, the resolution of which will inform whether the Brenner memo, as viewed by the trier of fact, violated the non-disparagement clause. We reverse the district court's grant of summary judgment on the breach of contract claim, and remand for further proceedings consistent with this opinion.