# IN THE SUPREME COURT, STATE OF WYOMING

## 2026 WY 31

OCTOBER TERM, A.D. 2025
March 6, 2026

RICHARD W. ADAMS; KELLY A.
ADAMS; and ADAMS & BAILEY, LLC, a
Wyoming close limited liability company,

Appellants
(Plaintiffs),

v.

ANB BANK, a Wyoming branch bank;
CAPITAL MANAGEMENT
RESOURCES, LLC, a Colorado limited
liability company; and TIM ANDERSON,
in his capacity as a representative of ANB
Bank of Wyoming,

Appellees
(Defendants).

S-25-0103, S-25-0182

---

*Appeal from the District Court of Natrona County*
*The Honorable Catherine E. Wilking, Judge*

*Representing Appellants:*
Philip A. Nicholas, Nicholas & Tangeman, LLC, Laramie, Wyoming. Argument by Mr. Nicholas.

*Representing Appellees:*
Erin E. Berry and Christine L. Jordan, Hirst Applegate, LLP, Cheyenne, Wyoming. Argument by Ms. Berry.

*Before BOOMGAARDEN, C.J., and GRAY, FENN, and HILL, JJ., and MCKAY, D.J.*

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**GRAY, Justice.**

[¶1]    Richard and Kelly Adams (the Adamses) and Adams & Bailey, LLC[1] (collectively the Adams Family Parties) sued American National Bank (ANB), Capital Management Resources, LLC (CMR), and Tim Anderson, President of ANB's Casper, Wyoming branch (collectively the Banks) alleging their actions and omissions relating to a March 17, 2017 mortgage and a May 22, 2019 settlement agreement resulted in Adams & Bailey wrongly losing the equity in its commercial property and the Adamses wrongly losing the equity in their home.  ANB and CMR counterclaimed against Adams & Bailey, alleging it breached the May 22, 2019 settlement agreement and the covenant of good faith and fair dealing implied therein.  They also sought their attorney fees and costs.  The district court dismissed or granted summary judgment in favor of the Banks on all claims and counterclaims and awarded the Banks $200,963.19 in attorney fees and costs.  We affirm the district court's dismissal and summary judgment orders with respect to the Adams Family Parties' claims.  We reverse the district court's grant of summary judgment to the Banks on the counterclaims and the award of attorney fees and costs.

### ISSUES

[¶2]    The following issues are dispositive:

1.    Did the district court properly interpret and enforce the March 17, 2017 mortgage?

2.    Did the district court err by granting summary judgment to the Banks on the Adams Family Parties' negligent misrepresentation/fraud claim?

3.    Did the district court properly interpret and enforce the May 22, 2019 settlement agreement?

4.    Did the district court err by granting summary judgment to the Banks on the counterclaims?

5.    Did the district court err by awarding the Banks their attorney fees and costs?

---

[1] Adams & Bailey's certificate of organization and its operating agreement state its name as "Adams and Bailey, LLC."  We will refer to it as Adams & Bailey to avoid confusion with ANB and the individual parties involved in this matter.

1

[¶3]  This case presents a lengthy and complex factual history, involving multiple individual parties, various limited liability companies and banks, and numerous loans and promissory notes secured by various collateral and mortgages.  This appeal turns on the execution of two contracts—a March 17, 2017 mortgage and a May 22, 2019 settlement agreement.  We confine our recitation of the facts to those necessary to place these contracts in context and will address other facts where relevant in the discussion of the issues.

## A.    March 17, 2017 Mortgage

[¶4]  The Adamses, married residents of Casper, Wyoming, owned a home on Tuffy Road.  They formed two entities central to this dispute—Cobra Well Testers, LLC (Cobra) in 2004 and Adams & Bailey in 2008.  Cobra provided high-pressure well testing to the oil and gas industry, while Adams & Bailey was used to purchase commercial property on Salt Creek Highway in Casper, Wyoming (Salt Creek Property).  First Interstate Bank (FIB) provided financing for Adams & Bailey's purchase of the Salt Creek Property in the amount of $289,500 (Commercial Property Loan).  Adams & Bailey granted FIB a mortgage on the Salt Creek Property (First Position Commercial Mortgage), and the Adamses granted FIB a second position mortgage on their home (Second Position Residential Mortgage).  Adams & Bailey leased the Salt Creek Property to Cobra for $3,200 a month.  Adams & Bailey used the rental income to make the monthly payment on the Commercial Property Loan.  On January 1, 2014, the Adamses' daughter and son-in-law, Yavette and Nick Bailey (the Baileys), became members of Adams & Bailey.

[¶5]  In April 2014, the Adamses sold their membership interests in Cobra to the Baileys for approximately $4 million.  To finance the purchase of Cobra, the Baileys entered into an installment agreement with the Adamses under which they agreed to pay the Adamses $2,765,581.06 over 120 months at $23,046.51 per month.  The Baileys separately obtained a $1.5 million loan from ANB secured by Cobra's equipment to assist with the purchase and related costs.  At the same time, Cobra obtained a $250,000 revolving line of credit (RLOC) from ANB, which was later increased to $450,000.

[¶6]  Between April 2014 and June 2016, oil prices dropped, resulting in a decline in drilling activity.  Cobra began experiencing significant financial issues.  While the Baileys were current on their loan payments to ANB, Cobra had maxed out its RLOC and lacked the funds to repay it.  ANB agreed to consolidate the Baileys' $1.5 million loan and Cobra's RLOC.  As a prerequisite to consolidating the loans, ANB required the Adamses to subordinate their outstanding seller note to ANB's new consolidated position.  On December 15, 2016, the Adamses signed a subordination agreement.  That same day, ANB and the Baileys entered into a one-year commercial loan agreement in the amount of $1,493,922.32 (hereinafter $1.49 Million Consolidated Loan or Consolidated Loan), and the Baileys executed Promissory Note No. 0011904205 (Note 205) for that amount.  Cobra

guaranteed repayment of the Consolidated Loan and granted ANB a security interest in its inventories, accounts, intangibles, and equipment.

[¶7]  Cobra's financial difficulties continued into 2017.  By January 2017, Cobra had overdrawn its accounts with ANB and was in danger of not meeting its payroll obligations. Later that month, ANB extended a short-term loan to Cobra of $125,000.  The loan matured in March 2017, at which time Cobra and the Baileys were unable to pay it.  Cobra was again unable to satisfy its payroll obligations.  Consequently, the Baileys asked ANB for an additional loan of $235,000.  ANB agreed to the loan, conditioned on Adams & Bailey executing a second position mortgage on the Salt Creek Property to ANB.  Adams & Bailey agreed.

[¶8]  On March 17, 2017, the Baileys and ANB entered into a short-term loan agreement for $235,000 ($235,000 Short-Term Loan or Short-Term Loan), the Baileys executed Promissory Note No. 0011904207 (Note 207) for that amount, and Cobra guaranteed repayment.  Almost simultaneously, Adams & Bailey granted ANB a second position mortgage on the Salt Creek Property (March 2017 Mortgage or Mortgage).  On October 30, 2017, the Baileys repaid the $235,000 Short-Term Loan.  Because it maintained the March 2017 Mortgage secured both the $235,000 Short-Term Loan and the outstanding $1.49 Million Consolidated Loan, ANB did not release the Mortgage.

## B.    May 22, 2019 Settlement Agreement

[¶9]  On May 31, 2018, Cobra filed for bankruptcy under Chapter 11 of the United States Bankruptcy Code.  ANB filed a creditor's claim for $1,510,421.84, which represented the principal ($1,350,496.66) still owing on the Consolidated Loan plus interest, late charges, and other costs including attorney fees.  The Adamses filed an unsecured claim for $1,461,825.46, the amount the Baileys still owed them for the purchase of Cobra.  Cobra continued to operate its business out of the Salt Creek Property as a debtor-in-possession.

[¶10]  On June 9, 2018, Adams & Bailey's Commercial Property Loan with FIB matured. Adams & Bailey did not pay the balance owing of $144,177.02.  On July 11, 2018, ANB, through its wholly owned subsidiary CMR, purchased the Commercial Property Loan from FIB for $140,528.13.  The purchase included the First Position Commercial Mortgage on the Salt Creek Property and the Second Position Residential Mortgage on the Adamses' home.

[¶11]  In January 2019, Cobra submitted a plan of reorganization to the bankruptcy court. ANB objected to the plan.  In April 2019, legal counsel for Cobra, ANB, and Adams & Bailey began settlement negotiations, which resulted in a "Settlement Agreement Providing for Treatment of Secured Claims, Addressing Surcharge Issues and Allowing for Sale of Assets and Payment of Administrative and Priority Claims Against the Estate" (Settlement Agreement or Agreement) dated May 22, 2019.

[¶12] Under the Settlement Agreement, ANB agreed to cap its creditor claim at $1,079,879.95 (Lender Claim Cap), and Adams & Bailey agreed to execute and deliver to CMR a quitclaim deed for the Salt Creek Property (Quitclaim Deed) upon the parties signing the Agreement. CMR could not record the Quitclaim Deed until certain conditions were fulfilled. All conditions for recording the Quitclaim Deed were contingent on Adams & Bailey first satisfying the Lender Claim Cap and the First Position Commercial Mortgage through the sale of the Salt Creek Property. The Settlement Agreement gave Adams & Bailey a maximum of 90 days (Sale Period) to sell the Salt Creek Property. If the Salt Creek Property was sold during the Sale Period, Adams & Bailey was required to apply the sale proceeds—up to the combined total—to the Lender Claim Cap and the First Position Commercial Mortgage. If the Lender Claim Cap and the First Position Commercial Mortgage were paid in full during the Sale Period, ANB was required to destroy the Quitclaim Deed and release the Second Position Residential Mortgage. If these obligations were not fully satisfied by the last day of the Sale Period, CMR was "authorized, without further action from any Party, to immediately record the [Quitclaim] Deed." If the Quitclaim Deed was recorded, ANB was required to (1) deem the First Position Commercial Mortgage to be paid in full, (2) apply a $335,014.45 credit to the Lender Claim Cap, and (3) release the Second Position Residential Mortgage.

[¶13] On May 23, 2019, the parties signed the Settlement Agreement, and Adams & Bailey executed the Quitclaim Deed in favor of CMR. On August 7, 2019, the bankruptcy court approved the Settlement Agreement and the Sale Period began. The next month, Cobra paid $199,440 to ANB, which reduced the Lender Claim Cap to $880,439.95. The Sale Period ended on November 5, 2019. Adams & Bailey did not sell or receive any purchase offers for the Salt Creek Property during the Sale Period. At the end of the Sale Period, the Commercial Property Loan had a balance of approximately $165,000 and the Lender Claim Cap remained $880,439.95.

[¶14] In May 2019, while the parties were negotiating the Settlement Agreement, the Adamses listed their home for sale. In July, they entered into a contract to sell the home for $525,000, and the sale closed on November 14, 2019. CMR received $167,068.79 at closing, which fully satisfied the Commercial Property Loan/First Position Commercial Mortgage. CMR then released the Second Position Residential Mortgage on the home. The next day, November 15, 2019, CMR recorded the Quitclaim Deed and ANB applied a $335,014.45 credit to the Lender Claim Cap. On December 3, 2019, ANB filed a motion in the bankruptcy court seeking an order requiring Cobra to sell its remaining assets to ANB for a credit bid of $254,360. The bankruptcy court granted the motion and dismissed the bankruptcy case in September 2020. Six months later, in March 2021, CMR sold the Salt Creek Property. After costs, CMR received $381,962.12 for the property.

## C.     This Lawsuit

[¶15]   In October 2020, the Adams Family Parties sued the Banks, asserting various claims related to ANB's failure to release the March 2017 Mortgage upon repayment of the $235,000 Short-Term Loan, misrepresentations made to them concerning the scope of the March 2017 Mortgage, and CMR's failure to record the Quitclaim Deed immediately after the conclusion of the Sale Period.  ANB and CMR counterclaimed against Adams & Bailey, contending it breached the Settlement Agreement and the covenant of good faith and fair dealing implied therein by filing this lawsuit.  They also argued they were entitled to their attorney fees and costs under the Settlement Agreement's fee-shifting provision.

[¶16]   The district court ultimately dismissed or granted summary judgment to the Banks on all claims and counterclaims.  The district court determined the March 2017 Mortgage was unambiguous and secured repayment of both the $235,000 Short-Term Loan and the $1.49 Million Consolidated Loan.  Accordingly, it concluded ANB was not required to release the March 2017 Mortgage upon repayment of the $235,000 Short-Term Loan because the Consolidated Loan remained outstanding.  The district court further held the Adams Family Parties could not satisfy the reliance element of their negligent misrepresentation/fraud claim because the alleged misrepresentations concerning the scope of the March 2017 Mortgage were contrary to the express terms of the Mortgage.  The district court interpreted the Settlement Agreement as permitting—but not requiring— CMR to record the Quitclaim Deed if both the Lender Claim Cap and the First Position Commercial Mortgage had not been fully paid by the conclusion of the Sale Period.  It also held that the Settlement Agreement did not prohibit CMR from collecting proceeds from the sale of the Adamses' home pursuant to the Second Position Residential Mortgage, and the Agreement did not require CMR to record the Quitclaim Deed before the Adamses sold their home.   The district court determined Adams & Bailey breached the Settlement Agreement and the implied covenant by filing this lawsuit, thereby depriving ANB and CMR of their right to resolution of the issues without expensive and lengthy litigation.  It found Adams & Bailey's conduct constituted a material breach of the Settlement Agreement, and the Banks were entitled to their attorney fees and costs under the Agreement's fee-shifting provision.  The Adams Family Parties timely appealed (Appeal No. S-25-0103).

[¶17]   The Banks subsequently filed a motion in the district court for their attorney fees and costs.  The district court granted the motion and ordered the Adams Family Parties to pay the Banks $200,963.19 in attorney fees and costs.  The Adams Family Parties appealed (Appeal No. S-25-0182).  We consolidated the appeals.

## STANDARD OF REVIEW

[¶18]   The district court dismissed some of the Adams Family Parties' claims for failure to state a claim under W.R.C.P. 12(b)(6).

5

> We review Rule 12(b)(6) dismissals de novo. *Peterson v. Laramie City Council*, 2024 WY 23, ¶ 9, 543 P.3d 922, 926 (Wyo. 2024). "We examine the same materials and apply the same standards as the district court, accepting the facts alleged in the complaint as true and viewing them in the light most favorable to the non-moving party." *Williams v. Lundvall*, 2024 WY 27A, ¶ 6, 545 P.3d 431, 433 (Wyo. 2024). "Dismissal is appropriate only if it is certain on the face of the complaint that the plaintiff cannot assert any facts that create entitlement to relief." *Id.*

*Hull v. N. Lincoln Hosp. Dist.*, 2025 WY 6, ¶ 19, 561 P.3d 791, 796 (Wyo. 2025).

[¶19]  The district court granted summary judgment to the Banks on the remaining claims and counterclaims.

> We review a grant of summary judgment de novo. "This Court affords no deference to the district court's ruling and, instead, reviews a 'summary judgment in the same light as the district court, using the same materials and following the same standards.'" *Hurst v. Metro. Prop. & Cas. Ins. Co.*, 2017 WY 104, ¶ 8, 401 P.3d 891, 895 (Wyo. 2017) (quoting *Lindsey v. Harriet*, 2011 WY 80, ¶ 18, 255 P.3d 873, 880 (Wyo. 2011)). "Summary judgment can be sustained only when no genuine issues of material fact are present and the moving party is entitled to judgment as a matter of law." *Rafter J. Ranch Homeowner's Ass'n v. Stage Stop, Inc.*, 2024 WY 114, ¶ 17, 558 P.3d 562, 569 (Wyo. 2024) (quoting *Gumpel v. Copperleaf Homeowners Ass'n, Inc.*, 2017 WY 46, ¶ 24, 393 P.3d 1279, 1289 (Wyo. 2017)); W.R.C.P. 56(c). "When, as here, the district court resolved the case by the grant and denial of cross-motions for summary judgment, 'both the grant and the denial of the motions for a summary judgment are subject to appeal' if the decision completely resolves the case." *Hurst*, ¶ 8, 401 P.3d at 895 (quoting *Lindsey*, ¶ 18, 255 P.3d at 880).

*Teton Cnty. Bd. of Cnty. Comm'rs v. Bd. of Land Comm'rs*, 2025 WY 48, ¶ 8, 567 P.3d 675, 678 (Wyo. 2025).

[¶20]  We review de novo the district court's interpretation of the March 2017 Mortgage and the Settlement Agreement. *Eiden Constr., LLC v. Hogan & Assocs. Builders, LLC*, 2024 WY 138, ¶ 44, 561 P.3d 304, 318 (Wyo. 2024) ("Contract interpretation presents questions of law which we review de novo." (quoting *Larson v. Burton Constr., Inc.*, 2018

6

WY 74, ¶ 16, 421 P.3d 538, 544 (Wyo. 2018))). *See also Richardson v. State ex rel. Wyo. Dep't of Health*, 2024 WY 47, ¶ 16, 547 P.3d 327, 332 (Wyo. 2024) ("We interpret settlement agreements de novo[.]"); *First Nat'l Bank of Laramie v. Cook*, 12 Wyo. 492, 76 P. 674, 676 (1904) ("A mortgage is a contract obligation, and is as sacred as any other contract[.]"). When reviewing a district court's award of attorney fees, we review de novo whether there is legal authority to award attorney fees, but we review for an abuse of discretion the final fee award. *Redland v. Kimsey*, 2025 WY 85, ¶ 45, 573 P.3d 497, 511–12 (Wyo. 2025).

## DISCUSSION

### I. Did the district court properly interpret and enforce the March 17, 2017 mortgage?

### A. The District Court's Interpretation of the March 2017 Mortgage

[¶21] The Adams Family Parties argue the district court erroneously interpreted the March 2017 Mortgage as securing repayment of both the $235,000 Short-Term Loan and the $1.49 Million Consolidated Loan. They claim the March 2017 Mortgage secured only repayment of the $235,000 Short-Term Loan and Wyo. Stat. Ann. § 34-1-132 required ANB to release the Mortgage when that loan was repaid in October 2017.

[¶22] "A mortgage is a contract obligation, and is as sacred as any other contract[.]" *First Nat'l Bank of Laramie*, 76 P. at 676. "A court's goal in interpreting a contract is to determine 'the parties' intent[.]'" *Jonah Energy LLC v. Wyo. Dep't of Revenue*, 2023 WY 87, ¶ 11, 534 P.3d 902, 906 (Wyo. 2023) (quoting *Hassler v. Circle C Res.*, 2022 WY 28, ¶ 12, 505 P.3d 169, 173 (Wyo. 2022)). "[W]e begin our analysis of any contract with the document's plain language." *Claman v. Popp*, 2012 WY 92, ¶ 26, 279 P.3d 1003, 1013 (Wyo. 2012) (citing *Hunter v. Reece*, 2011 WY 97, ¶ 17, 253 P.3d 497, 501–02 (Wyo. 2011)).

> [T]he words used in the contract are afforded the plain meaning that a reasonable person would give to them. *Doctors' Co. v. Insurance Corp. of America*, 864 P.2d 1018, 1023 (Wyo. 1993). When the provisions in the contract are clear and unambiguous, the court looks only to the "four corners" of the document in arriving at the intent of the parties. *Union Pacific Resources Co.* [*v. Texaco*], 882 P.2d [212,] 220 [(Wyo. 1994)]; *Prudential Preferred Properties* [*v. J and J Ventures*], 859 P.2d [1267,] 1271 [(Wyo. 1993)]. In the absence of any ambiguity, the contract will be enforced according to its terms because no construction is appropriate. *Sinclair Oil Corp. v. Republic Ins. Co.*, 929 P.2d 535, 539 (Wyo. 1996).

7

*Claman*, ¶ 26, 279 P.3d at 1013 (quoting *Hunter*, ¶ 17, 253 P.3d at 502 (quoting *Amoco Prod. Co. v. EM Nominee P'ship Co.*, 2 P.3d 534, 540 (Wyo. 2000))). "We review a contract in its entirety and consider each provision in light of the others, avoiding an interpretation that makes any provision inconsistent or meaningless." *Jonah Energy*, ¶ 11, 534 P.3d at 907 (citing *Thornock v. PacifiCorp*, 2016 WY 93, ¶ 13, 379 P.3d 175, 180 (Wyo. 2016)).

[¶23] Section 2 of the March 2017 Mortgage states Adams & Bailey, as Mortgagor, "grant[s], bargain[s], convey[s], mortgage[s] and warrant[s]" to ANB, as Lender, the Salt Creek Property "to secure the Secured Debts and [Adams & Bailey]'s performance under this Security Instrument." Section 3 of the Mortgage provides:

> **3. SECURED DEBTS.** The term "Secured Debts" includes and this Security Instrument will secure each of the following:
>
> > **A. Specific Debts.** The following debts and all extensions, renewals, refinancings, modifications and replacements. A promissory note or other agreement, No. 0011904207 [Note 207], dated March 17, 2017, from Nicholas Bailey and Yavette Bailey (Borrower) to [ANB], with a loan amount of $235,000 and maturing on May 1, 2017.
>
> .   .   .

Section 23 states:

> **23. OTHER TERMS.** The following are applicable to this Security Instrument:
>
> .   .   .
>
> > **B. Additional Terms.** In addition to the debts listed above in Section 3 of this Deed of Trust, this Deed of Trust shall secure each of the following, which are also "Secured Debts" for all purposes of this Deed of Trust: Promissory Note #0011904205 [Note 205], dated December 15, 2016.

[¶24] The district court correctly interpreted the March 2017 Mortgage as securing both the $235,000 Short-Term Loan and the $1.49 Million Consolidated Loan. Under Section 2 of the Mortgage, Adams & Bailey granted ANB a mortgage on the Salt Creek Property

8

to back the "Secured Debts."  Sections 3(A) and 23(B) define "Secured Debts" as those represented by Note 207 <u>and</u> Note 205.  Note 207 and Note 205 are the promissory notes associated with the $235,000 Short-Term Loan and the $1.49 Million Consolidated Loan, respectively.

[¶25]  The district court properly decided ANB was not required to release the March 2017 Mortgage upon repayment of the $235,000 Short-Term Loan when the $1.49 Million Consolidated Loan remained unpaid.  The March 2017 Mortgage states it "will remain in effect ***until the Secured Debts*** and all underlying agreements have been terminated in writing by [ANB]."  (Emphasis added.)  It is undisputed that while the $235,000 Short-Term Loan was repaid in October 2017, the $1.49 Million Consolidated Loan remained outstanding.

## B.      Adams Family Parties' Arguments

[¶26]  The Adams Family Parties advance six related arguments to support their position that the March 2017 Mortgage secures only the $235,000 Short-Term Loan (Note 207) and ANB was required to release the Mortgage upon repayment of the Short-Term Loan.  We address each argument.

### 1.  Wyo. Stat. Ann. § 34-1-132

[¶27]  The Adams Family Parties argue ANB was required to release the March 2017 Mortgage upon repayment of the $235,000 Short-Term Loan pursuant to Wyo. Stat. Ann. § 34-1-132.  That statute requires a mortgagee to release a mortgage "***if there has been full performance of the condition of the mortgage*** and if there is no other written agreement between the mortgagee and mortgagor encumbering the property subject to the mortgage."  Wyo. Stat. Ann. § 34-1-132(a) (LexisNexis 2025) (emphasis added).  The "condition" of the March 2017 Mortgage was repayment of the "Secured Debts," which included the debts associated with Note 207 <u>and</u> Note 205.  ANB was not required to release the March 2017 Mortgage under Wyo. Stat. Ann. § 34-1-132 until it received repayment of both the $235,000 Short-Term Loan (Note 207) and the $1.49 Million Consolidated Loan (Note 205).

### 2.  Section 1 of the March 2017 Mortgage

[¶28]  The Adams Family Parties assert the words "this transaction" in Section 1 of the March 2017 Mortgage refer exclusively to the $235,000 Short-Term Loan, not the $1.49 Million Consolidated Loan.  Section 1 of the March 2017 Mortgage defines the word "loan" as "this transaction generally, including obligations and duties arising from the terms of all documents prepared or submitted for this transaction."  The Adams Family Parties' interpretation is overly restrictive and ignores both the plain language of the definition and the broader context of the mortgage instrument.  Even assuming arguendo

9

that "this transaction" refers to the $235,000 Short-Term Loan, the definition of "loan" expressly includes "obligations and duties arising from the terms of all documents prepared or submitted for this transaction." The March 2017 Mortgage is undeniably a "document[] prepared or submitted for this transaction" and one of the "obligations and duties arising from [its] terms" is that the Salt Creek Property serve as security for repayment of the "Secured Debts." The Mortgage's operative sections make clear that "Secured Debts" encompass all obligations covered by the instrument, including the debts associated with both the $235,000 Short-Term Loan (Note 207) and the $1.49 Million Consolidated Loan (Note 205).

### 3. Section 3 of the March 2017 Mortgage & Wyo. Stat. Ann. § 34-2-107

[¶29] The Adams Family Parties argue the "Specific Debts" clause of Section 3 controls the transaction. Section 3 on the first page of the March 2017 Mortgage defines "Secured Debts" with a "Specific Debts" clause which explicitly identifies the debt by note (Note 207), borrower names (the Baileys), amount ($235,000), and due date (May 1, 2017). The Adams Family Parties assert that the explicit identification in Section 3 of Note 207 (by note number, borrower names, amount, and due date) was intended to clearly define all secured debts in a single location, created a presumption that no other secured debt existed, and that "[a] reasonable person reading the SECURED DEBTS would not go searching for inconsistent language" buried in Section 23(B) on page 6. They also contend that even if a reader examined Section 23(B), the provision does not clearly describe the additional debt because it fails to identify the debtor by name or state the amount owed, as they claim is required by Wyo. Stat. Ann. § 34-2-107.[2]

[¶30] The Adams Family Parties' position is contrary to settled principles of contract interpretation. Courts are required to "review a contract in its entirety and consider each provision in light of the others, avoiding an interpretation that makes any provision inconsistent or meaningless." *Jonah Energy*, ¶ 11, 534 P.3d at 907 (citing *Thornock*, ¶ 13, 379 P.3d at 180). Equally unavailing is their invocation of Wyo. Stat. Ann. § 34-2-107, which provides only a permissive, not mandatory, statutory form for real estate mortgages ("may be in the following form") and sets forth a basic template with placeholders for the mortgagor, amount of indebtedness, due date, interest rate, and property description. *See May*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/may

---

[2] The Adams Family Parties also argue that if they examined Section 23(B), they would not know what Promissory Note #0011904205 (Note 205) described because they were not parties to that note. While the Adams Family Parties were not parties to Note 205, that note was signed in conjunction with the $1.49 Million Consolidated Loan. The Adamses were aware of the Consolidated Loan because they signed an agreement subordinating the Baileys' debt to them for the purchase of Cobra to the Consolidated Loan. More importantly, as we note later, by signing the March 2017 Mortgage, Adams & Bailey "cannot avoid it on the ground that [it] did not attend to its terms . . . ." *Fleig v. Est. of Fleig by & through Fleig*, 2018 WY 30, ¶ 12, 413 P.3d 638, 642 (Wyo. 2018) (quoting *Est. of Dahlke ex rel. Jubie v. Dahlke*, 2014 WY 29, ¶ 50, 319 P.3d 116, 128 (Wyo. 2014)).

(last visited Feb. 20, 2026) (defining "may" as "have permission to"); *Anderson v. Bd. of Cnty. Comm'rs of Teton Cnty.*, 2009 WY 122, ¶ 22, 217 P.3d 401, 407 (Wyo. 2009) ("[T]he use of the permissive word 'may' authorizes the specified action, but does not require it."). Neither the "Specific Debts" clause nor § 34-2-107 supports limiting the March 2017 Mortgage to solely the $235,000 Short-Term Loan. The document, construed as a whole under Wyoming law, confirms that the Salt Creek Property secures both the Short-Term Loan and the Consolidated Loan, and the statute does not impose a requirement that every mortgage be identically detailed or precisely follow the exemplar format.[3]

### 4. Unawareness/Failure to Read Section 23(B)

[¶31] The Adams Family Parties ask us to disregard Section 23(B) entirely because they were unaware of it or did not read it. Wyoming law is clear that "[o]ne who signs a contract generally cannot avoid it on the ground that he did not attend to its terms, or did not read it, or supposed that it was different in its terms, or that he took someone's word as to what it contained." *Fleig v. Est. of Fleig by & through Fleig*, 2018 WY 30, ¶ 12, 413 P.3d 638, 642 (Wyo. 2018) (quoting *Est. of Dahlke ex rel. Jubie v. Dahlke*, 2014 WY 29, ¶ 50, 319 P.3d 116, 128 (Wyo. 2014) (quoting *Laird v. Laird*, 597 P.2d 463, 467 (Wyo. 1979))). While we are sympathetic to the Adams Family Parties' plight, this rule forecloses their request to ignore Section 23(B) based on their unawareness or failure to read it.

### 5. Section 23(B)'s Reference to Deed of Trust

[¶32] The Adams Family Parties point to a drafting anomaly: Section 23(B) refers to a "deed of trust" rather than a "mortgage." It is obvious, however, that "deed of trust" in Section 23(B) refers to the March 2017 Mortgage. The operative text reads: "In addition to the debts listed above in ***Section 3 of <u>this</u> Deed of Trust*, *<u>this</u> Deed of Trust*** shall secure each of the following, which are also 'Secured Debts' for all purposes of ***<u>this</u> Deed of Trust*** . . . ." (Emphasis added.) While there are technical differences between a deed of trust and a mortgage—most notably in the parties involved (deed of trust includes a neutral trustee) and foreclosure procedures (deeds of trust often allow non-judicial foreclosure)—their core function and purpose are identical—both serve to secure repayment of a debt by conveying a security interest in real property to the lender (or trustee for the lender's benefit). *See*

---

[3] The Adams Family Parties emphasize they were not direct debtors of ANB and never personally promised to pay or guarantee any of Cobra's or the Baileys' debts. This is factually accurate in a narrow sense: neither the Adamses nor Adams & Bailey signed a separate personal guarantee or borrowed funds directly from ANB. However, this point is irrelevant to the scope of the March 2017 Mortgage. Adams & Bailey—an entity formed and largely controlled by the Adamses—executed the Mortgage as mortgagor. Under its plain terms, Adams & Bailey granted ANB a mortgage on the Salt Creek Property "to secure the Secured Debts and [Adams & Bailey]'s performance under" the Mortgage. It also "agree[d] that all payments under the Secured Debts will be paid when due and in accordance with the terms of the Secured Debts and this Security Instrument." The "Secured Debts," as defined in the integrated instrument, expressly include both the $235,000 Short-Term Loan (Note 207) and the $1.49 Million Consolidated Loan (Note 205).

54A–55 Am. Jur. 2d *Mortgages* §§ 1, 109, 110, 445 (2020) (explaining that both instruments pledge real property to secure indebtedness, with differences primarily in form and enforcement mechanics rather than substance). The use of "deed of trust" here is a harmless misnomer that does not alter the instrument's legal effect or the clear intent to expand "Secured Debts" beyond Section 3's specifics. *Cf. Tollefson v. Wyo. State Ret. Bd.*, 2003 WY 150, ¶ 16, 79 P.3d 518, 524 n.3 (Wyo. 2003) (perceiving inaccuracy in employment contract concerning its effective date "to be a scrivener's error").

### 6. Extrinsic Evidence

[¶33] Despite the plain language of the March 2017 Mortgage stating it secures repayment of both the Short-Term Loan and the Consolidated Loan, the Adams Family Parties point to extrinsic evidence (loan overviews, insurance requirements, and internal memos) which they claim shows the parties did not intend for the Mortgage to secure the $1.49 Million Consolidated Loan. They raise a loan overview prepared by ANB loan officer Brent Russ on March 16, 2017, to ANB's Executive Loan Committee which shows the $235,000 Short-Term Loan was to be secured by a second position mortgage on the Salt Creek Property and the $1.49 Million Consolidated Loan was secured by Cobra's equipment. The Adams Family Parties point to an "Agreement to Provide Insurance," signed by Adams & Bailey immediately after signing the March 2017 Mortgage, requiring $235,000 in insurance for the Salt Creek Property. Consistent with this agreement, the Adams Family Parties provided ANB an insurance policy for $235,000 which stated the March 2017 Mortgage secured the $235,000 Short-Term Loan. Finally, they rely on a May 1, 2017 memo from Mr. Anderson to ANB's Executive Loan Committee seeking an extension of the deadline for repayment of the $235,000 Short-Term Loan. In the memo, he reports (1) the $235,000 Short-Term Loan is secured by a lien on Cobra's equipment and the March 2017 Mortgage and (2) the $1.49 Million Consolidated Loan is secured by a lien on Cobra's equipment.

[¶34] The Adams Family Parties recognize the general rule against the use of extrinsic evidence when interpreting an unambiguous contract. *See generally Chesapeake Expl., LLC v. Morton Prod. Co., LLC*, 2025 WY 15, ¶ 32, 562 P.3d 1286, 1296 (Wyo. 2025) ("Courts will only turn to extrinsic evidence and rules of contract construction if a contract is ambiguous and its meaning is doubtful or uncertain."). The Adams Family Parties then direct us to case law stating we can look to the surrounding circumstances, facts showing the relation of the parties, the contract's subject matter, and the purpose for making the contract to determine the parties' intent even when reviewing an unambiguous contract. This principle of contract interpretation applies only "in situations where an otherwise unambiguous term had a different, special, or technical usage at the time the contract was executed." *Id.* ¶ 48, 562 P.3d at 1299 (quoting *Thornock*, ¶ 19, 379 P.3d at 181). *See also Jonah Energy*, ¶ 31, 534 P.3d at 912 ("Facts and circumstances outside the four corners of the contract cannot be used to explain, in general terms, what parties must have intended when they executed the contract. Extrinsic evidence is only admissible to provid[e] an

12

industry standard or a specialized meaning to a particular term." (citations and quotation marks omitted)). The Adams Family Parties have not identified any terms within the March 2017 Mortgage that had "a different, special, or technical usage" at the time it was signed. We do not consider the Adams Family Parties' extrinsic evidence.

[¶35] The March 2017 Mortgage is not ambiguous. By its plain terms, it secures repayment of both the $235,000 Short-Term Loan and the $1.49 Million Consolidated Loan. ANB was not required to release the March 2017 Mortgage upon repayment of the Short-Term Loan as the Consolidated Loan remained outstanding.

## C.    Enforceability of March 2017 Mortgage

[¶36] The Adams Family Parties argue that even if the district court correctly interpreted the March 2017 Mortgage as securing repayment of both the $235,000 Short-Term Loan and the $1.49 Million Consolidated Loan, the March 2017 Mortgage cannot be enforced as securing the Consolidated Loan because (1) Section 23(B) of the March 2017 Mortgage is an unenforceable dragnet clause; (2) there was no consideration to support extending the March 2017 Mortgage to the Consolidated Loan; and (3) Adams & Bailey was not authorized to pledge the Salt Creek Property as security for the Consolidated Loan. We address each argument.

### 1.  Dragnet Clause

[¶37] The Adams Family Parties argue that "[u]nbeknownst to [them] and contrary to the explicit representations made by ANB's officers to [them], ANB included a hidden, obscure dragnet clause within the boilerplate of the [March 2017] Mortgage on page 6, paragraph 23." They contend the dragnet clause is unenforceable because it does not clearly identify that Note 205 belongs to the Baileys[4] for an antecedent debt or the amount of the debt.

[¶38] A dragnet clause (also known as an "anaconda" clause) in a mortgage or deed of trust is a provision that extends the security interest in the real property to debt that the borrower already owes or may in the future owe to the lender.[5] *United Nat'l Bank v. Tellam*, 644 So. 2d 97, 98 (Fla. Dist. Ct. App. 1994); *Lundgren v. Nat'l Bank of Alaska*, 756 P.2d 270, 277 (Alaska 1987). Such clauses facilitate ongoing lending relationships by allowing collateral to secure future obligations, but courts scrutinize them closely because

---

[4] The Adams Family Parties mistakenly state throughout their brief that Note 205 and its corresponding debt belong to Cobra. Note 205 was signed by the Baileys and its corresponding debt (the $1.49 Million Consolidated Loan) belongs to them.

[5] The Banks claim Section 23(B) is not a dragnet clause because it specifically identifies the debt. While courts consider specificity when determining the enforceability of a dragnet clause, specificity is not controlling in determining whether a clause qualifies as a dragnet clause. Section 23(B) is a dragnet clause because it uses the Salt Creek Property to secure pre-existing debt.

of their potential to "enwrap the unsuspecting debtor in the folds of indebtedness embraced and secured in the mortgage which he did not contemplate." *United Nat'l Bank*, 644 So. 2d at 98 (quoting *Berger v. Fuller*, 180 Ark. 372, 21 S.W.2d 419, 421 (1929)).

[¶39]  While dragnet clauses may apply to both antecedent debts and future advances, the clause in this case involves only antecedent debt—the $1.49 Million Consolidated Loan represented by Note 205, executed December 15, 2016.  Courts have taken divergent approaches to enforcing dragnet clauses for antecedent debts:

- **Strict approach:** Some jurisdictions refuse to extend a mortgage to antecedent debt unless the debt is specifically identified in the mortgage.  *See, e.g.*, *Lundgren*, 756 P.2d at 278–79; *United Nat'l Bank*, 644 So. 2d at 98; *First Nat'l Bank & Tr. Co. v. Lygrisse*, 647 P.2d 1268, 1271–72 (Kan. 1982).  These courts reason that if the parties truly intended coverage, they would have expressly named the prior debt.  *United Nat'l Bank*, 644 So. 2d at 98.

- **Lenient approach:** Other courts enforce broadly worded dragnet clauses without requiring specific identification of antecedent debt (e.g., all "existing or future" loans or "[a]ll indebtedness of mortgagors now existing or hereafter incurred"), provided the clause clearly manifests intent to cover past obligations.  *See Horob v. Farm Credit Servs. of N.D. ACA*, 2010 ND 6, ¶ 17–18, 777 N.W.2d 611, 616; *Clovis Nat'l Bank v. Harmon*, 1984-NMSC-119, ¶ 9, 692 P.2d 1315, 1318 (emphasis omitted).  These courts emphasize that parties could limit coverage if desired.  *Clovis Nat'l Bank*, ¶ 10, 692 P.2d at 1318.

[¶40]  Wyoming precedent leans toward the more lenient approach, at least in an analogous context.  In *First Nat'l Bank, Cortez, Colo. v. First Interstate Bank, Riverton, Wyo.*, 774 P.2d 645, 647 (Wyo. 1989) (*Cortez II*), we enforced a dragnet clause in a Uniform Commercial Code (UCC) security agreement that secured antecedent debt without specifying the amount or details of the prior obligation.  Mr. and Mrs. Walker borrowed $93,000 from Riverton Bank and the loan was secured by two drilling rigs.  Later, they borrowed $7,328.35 from Riverton Bank and this loan was secured by the Walkers' airplane.  *Id.*  The security agreement, which was properly recorded, specifically referred to the $7,328.35 loan and contained a dragnet clause stating:

> [T]his security agreement secures all amounts [the Walkers] owe to [Riverton] Bank, whether now or later.  This means that every loan [the Walkers] have now or get later is secured by this security agreement, as well as any other amount [they] may owe to the Bank (such as an overdraft on [their] checking account).

*Id.* At the time of the $7,328.35 loan, the Walkers owed Riverton Bank $77,605 on the prior $93,000 loan. *Id.* A few months later, Mr. Walker obtained a $58,836.73 loan from Cortez Bank and granted Cortez Bank a security interest in the Walkers' airplane. *Id.* After an apparent default, Riverton Bank sold the airplane and other collateral for $70,000 and retained all the sale proceeds. *Id.* Cortez Bank sued Riverton Bank, claiming it was entitled to the proceeds from the sale of the airplane in excess of $7,328.35, the amount specified in the recorded security agreement. *Id.* at 647–48. We concluded the dragnet clause "specifically provided" coverage for all amounts owed (existing or future) and gave subsequent creditors constructive notice to inquire further. *Id.* at 648, 650. While *Cortez II* was decided under the UCC and did not specifically address the validity of a dragnet clause in a real estate mortgage, it did interpret the dragnet clause in the security agreement as (1) "specifically provid[ing], as between the Walkers and the Riverton Bank, that all amounts owed to [Riverton Bank], whether then existing or later advanced, were covered by the security agreement" and (2) "clearly manifest[ing] the intention of the parties that the aircraft served as collateral to secure the pre-existing debt." *Id.* at 648. It also found there was "no question that the Walkers and the Riverton Bank intended that the [airplane] serve as security for previously existing indebtedness."[6] *Id.* at 650.

[¶41] We need not definitively adopt one approach here, however, because Section 23(B) of the March 2017 Mortgage satisfies even the strict approach. The March 2017 Mortgage clearly identifies the antecedent debt—Promissory Note #0011904205 (Note 205), dated December 15, 2016. It specifically states the note is a "Secured Debt" under Section 3.

[¶42] The Adams Family Parties argue the dragnet clause is not enforceable because it does not identify the owner of the note or its amount. They do not provide legal authority for their argument that a dragnet clause is only enforceable if it identifies the owners and amount of the debt. Case law suggests there is no such requirement. *See Dixie Ag Supply, Inc. v. Nelson*, 500 So. 2d 1036, 1040 (Ala. 1986) ("The failure to describe the existing indebtedness with more specificity as to date and amount of past due balance does not create an ambiguity, because the security agreement refers to a specific existing promissory note. Therefore, the more general reference to the existing Garris/Dixie Ag promissory note and existing debt was sufficient."). *Cf. Cortez II*, 774 P.2d at 650 (concluding, in the

---

[6] The Adams Family Parties rely on our decision in *First Nat'l Bank, Cortez, Colo. v. First Interstate Bank, Riverton, N.A., Wyo.*, 758 P.2d 1026, 1032 (Wyo. 1988) (*Cortez I*), *vacated on reh'g*, 774 P.2d 645 (Wyo. 1989), to claim that "[w]here a mortgage is given to secure a specific debt named, the security will not be extended as to antecedent debts unless the instrument so provides and identifies those intended to be secured in clear terms[.]" As the Adams Family Parties acknowledge, *Cortez I* was vacated on rehearing by *Cortez II*. Nevertheless, they claim that *Cortez II* did not overrule the above statement of law in *Cortez I* but instead "created a narrow exception . . . where the transaction was in goods covered by the Uniform Commercial Code and the antecedent debts belonged to the creditor and were adequately described in a properly filed UCC filing statement." *Cortez II* specifically held *Cortez I* "was in error" and "vacated" it. *Cortez II*, 774 P.2d at 646. *Cortez I* is no longer good law.

15

UCC context, that "[t]he law does not require that a security agreement recite the amount of the debt secured").

[¶43] Because the dragnet clause in the March 2017 Mortgage specifically identifies the antecedent debt, it is valid and enforceable with respect to that debt.

### 2. Consideration

[¶44] The Adams Family Parties argue the March 2017 Mortgage cannot be enforced as to the $1.49 Million Consolidated Loan because there was no consideration for extending the Mortgage to that loan. They say ANB did not negotiate any concessions or extensions of the $1.49 Million Consolidated Loan or make any other promise to Adams & Bailey in exchange for its agreement to mortgage the Salt Creek Property for the purpose of securing the Consolidated Loan.

> "The basic elements of a contract are offer, acceptance and consideration." *McLean v. Hyland Enter., Inc.*, 2001 WY 111, ¶ 42, 34 P.3d 1262, 1272 (Wyo. 2001) (citing *Bouwens v. Centrilift*, 974 P.2d 941, 946 (Wyo. 1999)). "A generally accepted definition of consideration is that a legal detriment has been bargained for and exchanged for a promise." *Moorcroft State Bank v. Morel*, 701 P.2d 1159, 1161–62 (Wyo. 1985). ***A sufficient legal detriment is the promise or performance of "any act, regardless of how slight or inconvenient, which [the promisee] is not obligated to promise or perform*** so long as it does so at the request of the promisor and in exchange for the promise." 3 Williston on Contracts § 7:4 (4th ed.), Westlaw (database updated November 2018). . . . Thus, "[v]aluable consideration . . . may consist of ***an exchange of mutual promises, which promises impose a legal liability upon each promisor***." *Kindred Healthcare Operating, Inc. v. Boyd*, 2017 WY 122, ¶ 42, 403 P.3d 1014, 1024–25 (Wyo. 2017) (quoting *Carroll v. Bergen*, 2002 WY 166, ¶ 12, 57 P.3d 1209, 1214 (Wyo. 2002)).

*Mantle v. N. Star Energy & Constr. LLC*, 2019 WY 29, ¶ 69, 437 P.3d 758, 784 (Wyo. 2019) (emphasis added).

[¶45] The March 2017 Mortgage was supported by valuable consideration. Adams & Bailey and ANB "exchanged mutual promises that imposed legal liability on each of them." *Mantle*, ¶ 70, 437 P.3d at 784. Adams & Bailey promised the Salt Creek Property as security for repayment of the $235,000 Short-Term Loan and the $1.49 Million Consolidated Loan and, in exchange, ANB promised to loan $235,000 to the Baileys to

keep Cobra financially afloat. "[T]he making of a loan constitutes valuable consideration." *Sturman v. First Nat'l Bank*, 729 P.2d 667, 676–77 (Wyo. 1986).

### 3. Authorization

[¶46] The Adams Family Parties argue the March 2017 Mortgage is invalid because Adams & Bailey was not authorized to mortgage the Salt Creek Property as security for the Baileys' debt. They contend that prior to executing the March 2017 Mortgage, Adams & Bailey signed an "Authorization" prepared by ANB in which it authorized its members to grant a security interest in the Salt Creek Property "for the payment or performance of all debts, liabilities and obligations of every type and description ***owed now or in the future by* [*Adams & Bailey*] *to* [*ANB*]**." (Emphasis added.) The Adams Family Parties argue that under the plain terms of the Authorization, Adams & Bailey could only mortgage the Salt Creek Property as security for Adams & Bailey's debts and therefore it had no authority to mortgage the Salt Creek Property as security for the $1.49 Million Consolidated Loan—debt belonging to the Baileys.

[¶47] The Authorization is irrelevant because Mr. Adams, as Adams & Bailey's manager, had the statutory and contractual authority to mortgage, on Adams & Bailey's behalf, the Salt Creek Property for the repayment of the $235,000 Short-Term Loan and the $1.49 Million Consolidated Loan. *See Montana Food, LLC v. Todosijevic*, 2015 WY 26, ¶¶ 21–23, 344 P.3d 751, 757–58 (Wyo. 2015) (looking to Wyoming's Limited Liability Company Act, the LLC's articles of organization, and its operating agreement to determine whether an LLC member had the authority to adjust the members' ownership interests). Wyoming's Limited Liability Company Act (Act) provides that in a manager-managed limited liability company like Adams & Bailey, the manager has exclusive decision-making authority over any matter relating to the company's activities "unless the articles of organization or the operating agreement provide otherwise." Wyo. Stat. Ann. § 17-29-407(c). Adams & Bailey's articles of organization and its operating agreement do not provide otherwise. The articles of organization give Mr. Adams "the power to do any and all acts necessary or convenient to or for the furtherance of the purposes of the Company set forth in these Articles and the Operating Agreement of the Company" and its operating agreement specifically provides Mr. Adams the authority to "execute and deliver, for and on behalf of the Company, such notes . . . , mortgages, and other security instruments and agreements in such form, and on such terms and conditions, as the Manager in the Manager's sole discretion deems proper." Consistent with this authority, Mr. Adams signed the March 2017 Mortgage as Adams & Bailey's manager and specifically confirmed to ANB in Section 11(B) of the Mortgage that the execution and performance of the Mortgage was "within [Adams & Bailey's] powers" and had been "duly authorized."

### D. Conclusion

[¶48] The district court properly interpreted and enforced the March 2017 Mortgage as securing repayment of both the $235,000 Short-Term Loan and the $1.49 Million Consolidated Loan. As a result, it properly decided ANB was not required to release the March 2017 Mortgage upon repayment of the $235,000 Short-Term Loan in October 2017 because the $1.49 Million Consolidated Loan had not been repaid. The district court correctly dismissed or granted summary judgment to the Banks on the Adams Family Parties' individual claims relating to the March 2017 Mortgage.[7]

## II.   Did the district court err by granting summary judgment to the Banks on the Adams Family Parties' negligent misrepresentation/fraud claim?

[¶49] The Adams Family Parties argue the district court erred by granting summary judgment to the Banks on their fraud/negligent misrepresentation claim. While not entirely clear, we glean from their statement of the case and the facts that the Adams Family Parties allege the misrepresentations made by Mr. Anderson and/or Mr. Russ are: (1) the March 2017 Mortgage was solely to secure repayment of the $235,000 Short-Term Loan, (2) ANB would apply all of Cobra's payments first to the Short-Term Loan, and (3) the March 2017 Mortgage would be released once the Short-Term Loan was repaid. The Adams Family Parties also contend Mr. Anderson and/or Mr. Russ failed to inform them of the dragnet clause in the March 2017 Mortgage.

[¶50] "The elements of negligent misrepresentation are false information supplied in the course of one's business for the guidance of others in their business; failure to exercise reasonable care in obtaining or relating the information; and pecuniary loss resulting from justifiable reliance thereon." *Sundown, Inc. v. Pearson Real Est. Co.*, 8 P.3d 324, 332 (Wyo. 2000) (citing *Richey v. Patrick*, 904 P.2d 798, 802 (Wyo. 1995); Restatement (Second) of Torts § 552(1) (1977)). "Intentional misrepresentation (fraud) is established

---

[7] The Adams Family Parties argue the district court improperly dismissed or granted summary judgment to the Banks on their claims relating to the March 2017 Mortgage—reformation of the mortgage, conversion, breach of the implied covenant of good faith and fair dealing, civil conspiracy, intentional infliction of emotional distress, and outrageous conduct. We decline to separately address these individual claims for three reasons. First, the Adams Family Parties did not seek reformation of the March 2017 Mortgage in their complaint and the issue is not jurisdictional or fundamental. *See Colton v. Town of Dubois*, 2022 WY 138, ¶ 2, 519 P.3d 976, 978 n.1 (Wyo. 2022) ("[T]his Court will not consider an issue raised for the first time on appeal unless it is jurisdictional or of such fundamental nature that it must be considered." (quoting *Moses Inc. v. Moses*, 2022 WY 57, ¶ 12, 509 P.3d 345, 350 (Wyo. 2022))). Second, their arguments with respect to civil conspiracy, intentional infliction of emotional distress, and outrageous conduct merely cite the elements of each claim without connecting those elements to the facts or informing us how the district court erred. *See Elder v. Jones*, 608 P.2d 654, 660 (Wyo. 1980) ("An appellant is required to present this court with relevant authority and cogent argument. It is not enough to identify a potential issue with the expectation that this court will flesh out the matter from there. The appellant, at a minimum, must attempt to relate the rule of law he depends upon to the facts of his case."). Finally, all of these claims, to the extent they were based on the March 2017 Mortgage, turned on the Adams Family Parties' mistaken contention that ANB wrongfully failed to release the March 2017 Mortgage upon repayment of the $235,000 Short-Term Loan.

when the following elements are proven: '(1) the defendant made a false representation intended to induce action by the plaintiff; (2) the plaintiff reasonably believed the representation to be true; and (3) the plaintiff relied on the false representation and suffered damages.'" *Dewey v. Wentland*, 2002 WY 2, ¶ 10, 38 P.3d 402, 409–10 (Wyo. 2002) (quoting *Sundown*, 8 P.3d at 330). Negligent misrepresentation must be established by a preponderance of the evidence, while intentional misrepresentation must be proved by clear and convincing evidence. *Id.* ¶ 10, 38 P.3d at 410 (citing *Verschoor v. Mountain W. Farm Bureau Mut. Ins. Co.*, 907 P.2d 1293, 1299 (Wyo. 1995)).

[¶51] The district court correctly granted summary judgment to the Banks on the Adams Family Parties' negligent misrepresentation/fraud claim. First, Mr. Anderson's and/or Mr. Russ's failure to disclose the existence of the dragnet clause in the March 2017 Mortgage cannot support a claim for misrepresentation, negligent or intentional, because nothing was represented. *See Pittard v. Great Lakes Aviation*, 2007 WY 64, ¶ 43, 156 P.3d 964, 976 (Wyo. 2007) ("[N]ondisclosure of information cannot support a claim for misrepresentation; since nothing has been represented, an essential element of the claim is missing." (quoting *Birt v. Wells Fargo Home Mortg., Inc.*, 2003 WY 102, ¶ 43, 75 P.3d 640, 657 (Wyo. 2003))). Next, even if we assume Mr. Anderson and/or Mr. Russ made misrepresentations concerning the scope of the March 2017 Mortgage, the Adams Family Parties cannot show an essential element of their claim—reasonable or justifiable reliance on the misrepresentations. That is because the alleged misrepresentations are directly contrary to the unambiguous terms of the March 2017 Mortgage, which state the Mortgage operates to secure both the $235,000 Short-Term Loan and the $1.49 Million Consolidated Loan. "Where a contract between the parties directly contradicts the alleged misrepresentations, there can be no justifiable reliance." *Miller Glob. Props., LLC v. Marriott Int'l, Inc.*, 418 S.W.3d 342, 348 (Tex. App. 2013). *See also Fleig*, ¶ 12, 413 P.3d at 642 ("[o]ne who signs a contract generally cannot avoid it on the ground that he did not attend to its terms, or did not read it, or supposed that it was different in its terms, *or that he took someone's word as to what it contained*" (emphasis added) (quoting *Est. of Dahlke*, ¶ 50, 319 P.3d at 128 (quoting *Laird*, 597 P.2d at 467))); *Nazareth Deli LLC v. John W. Dawson Ins. Inc.*, 2022-Ohio-3994, ¶ 62, 200 N.E.3d 652, 671 (appellants could not show they justifiably relied on any alleged misstatement that any vehicle driven for work would have $1 million in uninsured/underinsured motorist (UIM) coverage because "the commercial auto policy unambiguously demonstrated there was no UIM coverage, let alone $1 million in UIM coverage, for any vehicle").

### III. Did the district court properly interpret and enforce the May 22, 2019 settlement agreement?

### A. Interpretation of Settlement Agreement

[¶52] The Adams Family Parties contend the district court misinterpreted the Settlement Agreement in two respects: first, by concluding that it permitted—but did not require—

19

CMR to record the Quitclaim Deed immediately upon completion of the Sale Period; and second, by holding that the Agreement did not prohibit CMR from recording the Quitclaim Deed after collecting proceeds from the sale of the Adamses' home pursuant to the Second Position Residential Mortgage, even though the sale proceeds were sufficient to satisfy the First Position Commercial Mortgage. They claim that had the district court properly interpreted the Settlement Agreement as requiring CMR to immediately record the Quitclaim Deed at the conclusion of the Sale Period and prior to the sale of the Adamses' home, ANB would have been obligated to release the Second Position Residential Mortgage prior to the sale of the home and, as a result, CMR would not have been entitled to the $167,068.79 it received from the sale of the home.[8]

[¶53] Because "[a] settlement agreement is a contract," we apply our rules of contract interpretation set forth above. *Kappes v. Rhodes*, 2022 WY 82, ¶ 18, 512 P.3d 31, 36 (Wyo. 2022) (quoting *Matter of Est. of McCormick*, 926 P.2d 360, 362 (Wyo. 1996)). *See also Drewry v. Brenner*, 2025 WY 121, ¶¶ 27–28, 579 P.3d 49, 58 (Wyo. 2025) (applying our rules of contract interpretation to interpret a settlement agreement). Again, our primary goal is to give effect to the parties' intent as reflected by the plain language of the contract. *Jonah Energy*, ¶ 11, 534 P.3d at 906.

[¶54] To facilitate analysis of the Adams Family Parties' interpretations, we set forth the relevant terms of the Settlement Agreement. Section 4(a) provides:

> a. Upon execution of this Agreement, Adams & Bailey shall execute a quitclaim deed in favor of [ANB's] wholly owned subsidiary, [CMR] . . . , conveying the [Commercial] Property to CMR . . . . CMR shall not record the deed *until authorized to do so pursuant to this Agreement*. . . .

(Emphasis added.) Section 5 authorizes CMR to record the Quitclaim Deed as follows:

> Authorization to Record Deed. *In the event that [ANB] does not receive by the last day of the Sale Period payment in full of both the Lender Claim Cap and the [First Position Commercial Mortgage], CMR shall be authorized, without further action from any Party, to immediately record the [Quitclaim] Deed.* In the event the [Quitclaim] Deed is

---

[8] The district court decided that even if CMR acted wrongfully by failing to record the Quitclaim Deed prior to the sale of the Adamses' home, the Adamses would not have been entitled to the $167,068.79 CMR received from the sale of their home. It found the sale of the home was only able to proceed because the Internal Revenue Service agreed to release its tax liens on the home if the Adamses did not personally benefit from the sale. Because we conclude CMR did not act wrongfully with respect to the recording of the Quitclaim Deed, we need not address the question of whether the Adams Family Parties' failed to prove damages.

20

recorded by CMR under circumstances described in the preceding sentence, [ANB] shall deem its [First Position Commercial Mortgage] debt on the Adams & Bailey Property to be paid in full, and [ANB] shall also apply a credit of $335,014.45 or the remaining balance of the Lender Claim Cap, whichever is less, to the Lender Claim Cap. If CMR records the [Quitclaim] Deed in accordance with this Agreement, any proceeds realized from the disposition of the [Commercial] Property shall not be subject to the Lender Claim Cap. *Upon recording the* [*Quitclaim*] *Deed allowed herein*, [ANB] shall deem satisfied all personal guaranties of the loan from [ANB] to Adams & Bailey and *shall release any mortgage* [*ANB*] *has against the residence of Rick and Kelly Adams resulting from the loan from* [*ANB*] *to Adams & Bailey*.

(Emphasis added.)

[¶55] The district court did not err in interpreting the Settlement Agreement as permitting—but not requiring—CMR to record the Quitclaim Deed immediately upon completion of the Sale Period. Under its plain terms, Adams & Bailey was required to deliver the Quitclaim Deed to CMR upon the signing of the agreement. CMR, however, was not to record it "until authorized to do so pursuant to" the Settlement Agreement. The Settlement Agreement authorized CMR to immediately record the Quitclaim Deed if by the last day of the Sale Period, ANB did not receive the full amount of the Lender Claim Cap and the First Position Commercial Mortgage. The Adams Family Parties focus on the word "immediately," but the operative word is "authorized." As used in the Settlement Agreement, the term "authorized" is a verb and means "invest[ed] especially with legal authority: EMPOWER[ED]." *Authorize*, Merriam-Webster, *supra*. While CMR was empowered to immediately record the Quitclaim Deed if ANB did not receive the full amount of the Lender Claim Cap and the First Position Commercial Mortgage by the last day of the Sale Period, the Settlement Agreement did not require CMR to immediately record it.

[¶56] This conclusion is supported by other language in Section 5, which reads:

For the avoidance of doubt and without limiting the foregoing, if (i) [ANB] has not received payment in full of the Lender Claim Cap and the amount of the [First Position Commercial] Mortgage by the conclusion of the Sale Period . . . , or (ii) [Cobra] or Adams & Bailey is in breach of this agreement, *CMR may record the* [*Quitclaim*] *Deed*. If [ANB] has received payment in full of the Lender Claim Cap and the

21

[First Position Commercial] Mortgage by the dates set forth in this Agreement, [ANB] shall destroy the [Quitclaim] Deed, shall deem satisfied all personal guaranties of [ANB's] Claim and the loan from [ANB] to Adams & Bailey and shall release any mortgage [ANB] has against the residence of Rick and Kelly Adams resulting from the loan from [ANB] to Adams & Bailey.

(Emphasis added.) The use of the word "may" is permissive and "authorizes the specified action, but does not require it." *Anderson*, ¶ 22, 217 P.3d at 407. Under the Settlement Agreement, CMR was authorized, but not required, to immediately record the Quitclaim Deed if ANB did not receive by the last day of the Sale Period the full amount of the Lender Claim Cap and the First Position Commercial Mortgage.

[¶57] This reading is reinforced by provisions in the Settlement Agreement which demonstrate the parties knew precisely how to impose mandatory obligations when they wished to require action. For instance, the Settlement Agreement states Cobra "shall immediately, but in any event within 24 hours of receipt of an offer [to purchase the collateral], advise [ANB]" of the offer. It also provides that if Cobra sells any collateral, it "shall immediately deposit all gross proceeds from such sale" into its account with ANB. If the parties had intended to compel CMR to immediately record the Quitclaim Deed at the end of the Sale Period, they could have used imperative terms like "shall" or similar mandatory phrasing, consistent with their drafting elsewhere. They did not. Instead, they used the words "authorized" and "may," indicating their intent that CMR was permitted, but not required, to immediately record the Quitclaim Deed upon the completion of the Sale Period. *See Christensen v. Christensen*, 2008 WY 10, ¶ 17, 176 P.3d 626, 631 (Wyo. 2008) ("Had the parties to the agreement intended . . . to require . . . stockholders to purchase the shares of a stockholder wishing to sell during his lifetime, they could have used the word 'shall' [which is mandatory] in Article 5, just as it was used in Article 2. Instead, the agreement gives stockholders 'the right' to purchase the shares of a stockholder wishing to sell during his lifetime. This difference in language suggests the parties' intent was different with respect to the sale of stock after the death of a stockholder and sales during the lifetime of a stockholder." (citation omitted)).

[¶58] The district court also correctly concluded that the Settlement Agreement did not prohibit CMR from recording the Quitclaim Deed after collecting proceeds from the sale of the Adamses' home pursuant to the Second Position Residential Mortgage, even though the proceeds were sufficient to satisfy the First Position Commercial Mortgage. The Settlement Agreement expressly states the conditions under which ANB was required to release the Second Position Residential Mortgage: (1) if ANB received full payment of both the Lender Claim Cap <u>and</u> the First Position Commercial Mortgage by the end of the Sale Period or (2) if CMR recorded the Quitclaim Deed because ANB had not received such payment in full by the end of the Sale Period.

[¶59]  The Adams Family Parties argue the Settlement Agreement is ambiguous because it does not address when the Quitclaim Deed is to be recorded or when the Second Position Residential Mortgage is to be released in the event the First Position Commercial Mortgage was satisfied through the sale of the Adamses' home.  "Ambiguity is present where a contract term 'is obscure in its meaning because of indefiniteness of expression or because it contains a double meaning.'" *Comet Energy Servs., LLC v. Powder River Oil & Gas Ventures, LLC*, 2008 WY 69, ¶ 11, 185 P.3d 1259, 1263 (Wyo. 2008) (quoting *Ferguson v. Reed*, 822 P.2d 1287, 1289 (Wyo. 1991)).  The Settlement Agreement is not ambiguous. CMR was authorized to record the Quitclaim Deed if ANB did not receive payment in full of the Lender Claim Cap and the First Position Commercial Mortgage at the conclusion of the Sale Period.  ANB was not required to release the Second Position Residential Mortgage until it received full payment for both the Lender Claim Cap and the First Position Commercial Mortgage or, in the alternative, until the Quitclaim Deed was recorded because it had not received payment of these amounts.  In this case, even though ANB received proceeds from the sale of the Adamses' home which were sufficient to satisfy the First Position Commercial Mortgage, ANB was not required to release the Second Position Residential Mortgage because it had not received payment in full of the Lender Claim Cap.  For this same reason, CMR was authorized to record the Quitclaim Deed at the end of the Sale Period.  It was not, however, required to record the Quitclaim Deed under these circumstances.  We agree with the district court that the Adams Family Parties may have hoped or expected that CMR would record the Quitclaim Deed immediately upon the completion of the Sale Period—and before the closing on the sale of the Adamses' home—which would have required ANB to release the Second Position Residential Mortgage and thereby prevented ANB from receiving any proceeds from that home sale.  However, nothing in the Settlement Agreement required CMR to record the Quitclaim Deed at that time or under those circumstances.

[¶60]  The Adams Family Parties' hope or expectation does not create a contractual obligation where none exists.  CMR's decision to withhold recording despite the First Position Commercial Mortgage being satisfied was consistent with the Settlement Agreement and protected ANB's contractual right to repayment of the Lender Claim Cap.

## B.      Enforceability of Settlement Agreement

[¶61]  The Adams Family Parties argue that even if the district court correctly interpreted the Settlement Agreement, it is otherwise unenforceable in these proceedings because (1) the bankruptcy court lacked jurisdiction, (2) the Settlement Agreement does not contain a release of claims, (3) the Banks were the first to breach the Settlement Agreement, and (4) Adams & Bailey was improperly induced into signing the Settlement Agreement through economic duress and undue influence.  We address each argument.

### 1.  Bankruptcy Court Jurisdiction

[¶62] The Adams Family Parties argue the Settlement Agreement is not relevant or controlling in this matter because the bankruptcy court lacked jurisdiction over (1) Adams & Bailey as it was not a debtor and (2) the property that is the subject of this lawsuit—the Salt Creek Property and the Adamses' home—because it was not part of Cobra's bankruptcy estate and had no impact on that estate. We disagree.

[¶63] The Settlement Agreement requires that upon its execution, "[Cobra] shall immediately file a motion . . . seeking an order from the Bankruptcy Court approving this Agreement (the 'Approval Order'). This Agreement will have no force or effect until the entry of the Approval Order." The Agreement also states: "Each Party hereby consents to the jurisdiction and venue of the Bankruptcy Court for enforcement of this Agreement." Consistent with the Settlement Agreement, Cobra filed a motion for approval of the Settlement Agreement with the bankruptcy court on May 23, 2019. The bankruptcy court granted the motion on August 7, 2019. Thereafter, the Settlement Agreement was effective and enforceable, and Adams & Bailey expressly consented to the bankruptcy court's jurisdiction for its enforcement. Although the parties consented to the bankruptcy court's jurisdiction for certain enforcement purposes, the Settlement Agreement remains a binding contract independently enforceable in state court. *Kappes*, ¶ 18, 512 P.3d at 36 ("A settlement agreement is a contract[.]" (quoting *McCormick*, 926 P.2d at 362)). The district court possessed jurisdiction over its enforcement. *See, e.g., Richardson*, ¶¶ 16–17, 547 P.3d at 332–33 (determining whether Wyoming Department of Health's removal of respite services from adult son's individual plan of care violated settlement agreement entered into between Department and adult son's guardians); *Pellet v. Pellet*, 2022 WY 65, ¶¶ 43, 47, 510 P.3d 388, 401–02 (Wyo. 2022) (enforcing mediated settlement agreement between parties as a binding contract).

## 2. Release of Claims

[¶64] The Adams Family Parties argue the district court erred "in finding [the Settlement Agreement] bars [their] claims in these proceedings" because the Agreement does not contain a release of claims. The district court did not find the Settlement Agreement barred the Adams Family Parties' claims. Rather, it found the Adams Family Parties were not entitled to relief on their claims relating to the Settlement Agreement. The omission of a release of claims provision in the Settlement Agreement simply means the Agreement imposed no contractual bar to the Adams Family Parties bringing their claims in this action. *Kendrick v. Barker*, 2001 WY 2, ¶ 18, 15 P.3d 734, 740 (Wyo. 2001) ("A release discharges another from an existing or asserted . . . claim . . . , and it bars recovery thereon." (quoting *M & A Constr. Corp. v. Akzo Nobel Coatings, Inc.*, 936 P.2d 451, 456 (Wyo. 1997))); 66 Am. Jur. 2d *Release* § 1 (2021) ("[A] release is a discharge of a claim or obligation and a surrender of a claimant's right to prosecute a cause of action."). It does not mean their claims have merit or that they are otherwise entitled to relief on their claims. In short, the absence of a release provision is a neutral fact: it neither precludes the present lawsuit nor lends any support to the validity of the Adams Family Parties' claims.

24

### 3. The Banks First to Breach

[¶65] The Adams Family Parties argue the Settlement Agreement is not enforceable against them because the Banks were the first to breach it. They claim the Banks breached the Settlement Agreement in two ways. First, they contend that upon accepting the Quitclaim Deed, ANB had only one choice—to release the Second Position Residential Mortgage. It did not release the Second Position Residential Mortgage upon the acceptance of the Quitclaim Deed. Second, the Adams Family Parties claim that the Settlement Agreement required CMR to immediately record the Quitclaim Deed at the conclusion of the Sale Period. CMR did not immediately record the Quitclaim Deed upon the conclusion of the Sale Period but instead held the Quitclaim Deed until after the sale of the Adamses' home. Even though ANB received proceeds from that sale sufficient to pay off the First Position Commercial Mortgage, the Adams Family Parties contend CMR nevertheless recorded the Quitclaim Deed, thereby taking title to the Salt Creek Property while also taking equity from the Adamses' home.

> The basic premise of a first to breach affirmative defense is that "a party cannot claim the benefit of a contract that it was the first to materially breach." *Maverick Benefit Advisors, LLC v. Bostrom*, 2016 WY 96, ¶¶ 14–15, 382 P.3d 753, 758 (Wyo. 2016) (citing *White v. Empire Exp., Inc.*, 395 S.W.3d 696, 715–16 (Tenn. Ct. App. 2012); *Kinstler v. RTB S. Greeley, Ltd. LLC*, 2007 WY 98, ¶ 7, 160 P.3d 1125, 1127 (Wyo. 2007)). "The party asserting the affirmative defense bears the burden of proof. To establish the first-to-breach affirmative defense, the party asserting the defense must show that the other party breached first and that the breach was material." *Maverick*, ¶ 15, 382 P.3d at 758.

*Koch v. Gray*, 2024 WY 41, ¶ 12, 546 P.3d 1095, 1100 (Wyo. 2024). To establish a breach of contract, a plaintiff must show: "(1) 'a lawfully enforceable contract,' (2) 'an unjustified failure to timely perform all or any part of what is promised therein,' and (3) 'entitlement of [the] injured party to damages.'" *Kappes*, ¶ 17, 512 P.3d at 36 (quoting *Halling v. Yovanovich*, 2017 WY 28, ¶ 13, 391 P.3d 611, 616–17 (Wyo. 2017)).

[¶66] The Banks did not breach the Settlement Agreement. The Settlement Agreement did not require ANB to release the Second Position Residential Mortgage upon acceptance of the Quitclaim Deed. *See supra* ¶ 58. CMR was not required to record the Quitclaim Deed immediately upon conclusion of the Sale Period or before the Adamses sold their home. The Banks' receipt of proceeds from the sale of the home, sufficient to satisfy the First Position Commercial Mortgage, did not prohibit CMR from recording the Quitclaim Deed because ANB had not received the full amount of the Lender Claim Cap.

### 4. Inducement

[¶67]   The Adams Family Parties argue the Settlement Agreement is not enforceable because Adams & Bailey was induced into signing it through economic duress.  They allege Adams & Bailey was coerced into signing the Settlement Agreement through the Banks' misrepresentations and wrongful acts but do not inform us of the alleged misrepresentations and wrongful acts.  From their statement of the case and the facts, the Adams Family Parties appear to allege the following misrepresentations: Mr. Anderson and/or Mr. Russ told them the March 2017 Mortgage only secured the $235,000 Short-Term Loan and the Mortgage would be released once that loan was repaid.  The Mortgage was not released when the $235,000 Short-Term Loan was repaid because the Banks took the position that the March 2017 Mortgage also secured the $1.49 Million Consolidated Loan.  The March 2017 Mortgage clouded the Salt Creek Property's title, preventing the Adams Family Parties from refinancing the Commercial Property Loan.  Cobra then filed for bankruptcy.  After Cobra filed for bankruptcy, ANB took possession of the Salt Creek Property and then failed to pay rent and prevented Cobra from paying rent to Adams & Bailey despite their possession/use of the Salt Creek Property.  These actions prevented Adams & Bailey from paying off the Commercial Property Loan.  Thereafter, CMR purchased the loan, which included a right to collect rent upon default of the loan.  CMR failed to require ANB or Cobra to make rent payments to CMR, which it could have applied to the Commercial Property Loan, and instead started foreclosure proceedings on the Salt Creek Property.  To save the Adamses' home and prevent further financial collapse, the Adams Family Parties claim they had no other choice but to surrender the Salt Creek Property through Adams & Bailey's execution of the Settlement Agreement.

[¶68]   "[D]uress exists whenever a person is induced, by the unlawful act of another, to perform some act under circumstances which deprive him of the exercise of free will." *Pittard*, ¶ 36, 156 P.3d at 975 (quoting *Kendrick*, ¶ 24, 15 P.3d at 741).  To prove economic duress, as the Adams Family Parties alleged here, they had to show (1) they involuntarily accepted the terms of a contract, (2) circumstances permitted no other alternative, and (3) such circumstances were the result of the Banks' coercive acts.  *Id.*  "Economic duress does not exist . . . unless a person has been the victim of a wrongful act and has no reasonable alternative but to agree with the terms of another or be faced with a serious financial hardship." *Kendrick*, ¶ 24, 15 P.3d at 741 (quoting *Blubaugh v. Turner*, 842 P.2d 1072, 1074–75 (Wyo. 1992)).

[¶69]   The Adams Family Parties did not satisfy their burden of showing Adams & Bailey was induced into signing the Settlement Agreement through economic duress.  They made no showing that Adams & Bailey involuntarily accepted the terms of the Settlement Agreement.  In fact, Adams & Bailey (and the Adamses) were represented by counsel throughout the negotiation and execution of the Settlement Agreement.  The Adams Family Parties also failed to show that Adams & Bailey had no alternative but to sign the Settlement Agreement or face serious financial hardship.  Finally, the Adams Family Parties failed to show Adams & Bailey was the victim of the Banks' wrongful or coercive acts.  ANB was not required to release the

March 2017 Mortgage upon repayment of the $235,000 Short-Term Loan because the Mortgage also secured repayment of the $1.49 Million Consolidated Loan, which had not been repaid. The Adams Family Parties presented no evidence that ANB's and Cobra's failure to pay rent for their possession/use of the Salt Creek Property after Cobra filed for bankruptcy on May 31, 2018, caused Adams & Bailey to default in paying the Commercial Property Loan when it matured just nine days later on June 9, 2018. Under the First Position Commercial Mortgage, CMR had "the right" to collect rent upon a default and apply such income to the Commercial Property Loan and "[i]n furtherance of this right, [CMR] may require any tenant or other user of the Property to make payments of rent . . . directly to [CMR]." As the district court correctly determined, this language gave CMR the authority to collect rent, but it was not required to do so. In sum, the Adams Family Parties failed to show it was the Banks' actions—much less any wrongful or coercive acts—which left Adams & Bailey with no reasonable alternative but to execute the Settlement Agreement.

## C. Conclusion

[¶70] The district court properly interpreted and enforced the Settlement Agreement. It correctly dismissed or granted summary judgment to the Banks on the Adams Family Parties' individual claims relating to the Settlement Agreement and the failure to pay rent.[9]

## IV. Did the district court err by granting summary judgment to the Banks on the counterclaims?

[¶71] The district court granted summary judgment to the Banks on the counterclaims, concluding that Adams & Bailey breached the Settlement Agreement and the implied covenant of good faith and fair dealing by filing this lawsuit. In reaching this conclusion, the court relied

---

[9] The Adams Family Parties argue the district court improperly dismissed or granted summary judgment to the Banks on their claims relating to the Settlement Agreement and/or the failure to pay rent—conversion, breach of the implied covenant of good faith and fair dealing, civil conspiracy, declaratory relief, intentional infliction of emotional distress, and outrageous conduct. They also contend the court improperly dismissed their unjust enrichment claim relating to ANB's failure to pay rent for the use of the Salt Creek Property. We decline to separately address these individual claims for three reasons. First, the Adams Family Parties' arguments with respect to civil conspiracy, unjust enrichment, intentional infliction of emotional distress, and outrageous conduct merely cite the elements of each claim without connecting those elements to the facts or informing us how the district court erred. *Elder*, 608 P.2d at 660. ("An appellant is required to present this court with relevant authority and cogent argument. It is not enough to identify a potential issue with the expectation that this court will flesh out the matter from there. The appellant, at a minimum, must attempt to relate the rule of law he depends upon to the facts of his case."). Second, while the Adams Family Parties "now limit their unjust enrichment claim to ANB's use of the Salt Creek Property without paying rent," they did not allege in their complaint a claim for unjust enrichment based on ANB's failure to pay rent. Third, the claims relating to the Settlement Agreement were based on the Adams Family Parties' mistaken contention that the Agreement required CMR to immediately record the Quitclaim Deed upon completion of the Sale Period and before the closing occurred on the sale of the Adamses' home, and their claims relating to the failure to pay rent were based on their unproven contention that ANB and CMR acted wrongfully by not paying rent or requiring the payment of rent.

27

on two provisions in the Settlement Agreement. The first provision, entitled "Cooperation in Bankruptcy," states: "[Cobra] and Adams & Bailey shall cooperate with [ANB] with respect to [Cobra's] bankruptcy and the subject matter of this Agreement." The second provision, contained in the "Recitals" section of the Agreement, provides:

> The Parties anticipate a lengthy, expensive and contested plan confirmation process if the Parties cannot otherwise reach an agreement relating to the sale of the Lender Collateral and the [Commercial] Property, and the payment of administrative and priority claims against [Cobra's] bankruptcy estate. . . .

The district court determined that under the foregoing provisions, "Adams & Bailey knowingly and freely agreed to cooperate with ANB and CMR in an effort to efficiently and effectively resolve [without expensive and lengthy litigation] both the fundamental and ancillary consequences of Cobra's bankruptcy filing[.]" It found that consistent with the Agreement's stated goal, each party made concessions to avoid litigation—ANB agreed to reduce the amount it would receive in the bankruptcy proceedings (Lender Claim Cap) and Adams & Bailey agreed it would attempt to sell the Salt Creek Property to pay off the Lender Claim Cap and the First Position Commercial Mortgage. The parties also agreed that a failure to pay the full amount of the Lender Claim Cap and the First Position Commercial Mortgage would result in CMR becoming authorized to record the Quitclaim Deed and take title to the Salt Creek Property. By filing the pending lawsuit and "challenging the validity, enforcement, and interpretation of the contracts at issue," the court found Adams & Bailey was not only failing to cooperate with ANB and CMR but it was also actively working against them with respect to Cobra's "bankruptcy and . . . the various mortgages and loans at issue because of that bankruptcy," thereby depriving "ANB and CMR of the benefit they reasonably expected to receive by entering into the Settlement Agreement."

[¶72] The Adams Family Parties argue the district court erred by granting summary judgment to the Banks on the counterclaims because, *inter alia*, the cooperation clause only applies to the administration of Cobra's bankruptcy proceedings, they did not breach any duty imposed by the Settlement Agreement, and the Settlement Agreement does not contain a release of claims. We agree.

[¶73] "Wyoming has adopted the Restatement (Second) of Contracts § 205, which states that '[e]very contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement.'" *Bear Peak Res., LLC v. Peak Powder River Res., LLC*, 2017 WY 124, ¶ 68, 403 P.3d 1033, 1053 (Wyo. 2017) (quoting *Scherer Constr., LLC v. Hedquist Constr., Inc.*, 2001 WY 23, ¶¶ 17–18, 18 P.3d 645, 652–53 (Wyo. 2001)). We have described the implied covenant as follows:

> The implied covenant of good faith and fair dealing requires that neither party commit an act that would injure the rights of

28

> the other party to receive the benefit of their agreement. Compliance with the obligation to perform a contract in good faith requires that a party's actions be consistent with the agreed common purpose and justified expectations of the other party. A breach of the covenant of good faith and fair dealing occurs when a party interferes or fails to cooperate in the other party's performance. . . . The covenant of good faith and fair dealing may not, however, be construed to establish new, independent rights or duties not agreed upon by the parties. . . . The implied obligation must arise from the language used or it must be indispensable to effectuate the intention of the parties.

*Scherer Constr.*, ¶ 19, 18 P.3d at 653 (citations and quotation marks omitted). As we stated above, to establish a breach of contract, the Banks had to show: "(1) 'a lawfully enforceable contract,' (2) 'an unjustified failure to timely perform all or any part of what is promised therein,' and (3) 'entitlement of [the] injured party to damages.'" *Kappes*, ¶ 17, 512 P.3d at 36 (quoting *Halling*, ¶ 13, 391 P.3d at 616–17).

[¶74]   Adams & Bailey did not breach the Settlement Agreement or the implied covenant by filing this lawsuit. The cooperation clause is titled "Cooperation *in Bankruptcy*." (Emphasis added.) Consistent with its title, the clause requires Adams & Bailey and Cobra to "cooperate" with ANB "with respect to [Cobra's] bankruptcy and the subject matter of this Agreement." The plain meaning of "cooperate" is "to act or work with another or others: act together or in compliance." *See Cooperate*, Merriam-Webster, *supra*. "Subject matter" means "matter presented for consideration in discussion, thought, or study." *See Subject Matter*, Merriam-Webster, *supra*. Under the plain terms of the cooperation clause, Adams & Bailey agreed to work with ANB with respect to Cobra's bankruptcy and the "subject matter" of the Settlement Agreement. The "subject matter" of the Settlement Agreement was (1) the sale of the Salt Creek Property and Cobra's assets and (2) the payment of United States Trustee fees, administrative claims, and priority claims via a carveout from the proceeds of any sale of Cobra's assets. The filing of this lawsuit does not pertain to Cobra's bankruptcy or the "subject matter" of the Settlement Agreement.

[¶75]   The filing of this lawsuit was also not inconsistent with the Settlement Agreement's stated purpose. The parties stated they "*anticipate*[*d*] *a lengthy, expensive and contested plan confirmation process* if the Parties cannot otherwise reach an agreement . . . ." (Emphasis added.) This provision clearly reflects the Settlement Agreement's purpose to avoid protracted and costly litigation in Cobra's bankruptcy proceedings. The Settlement Agreement was not intended to preclude all subsequent litigation, including actions to enforce or interpret the Agreement itself in state court.

[¶76]   Finally, nothing in the Settlement Agreement prohibited the filing of this lawsuit. In the complaint, Adams & Bailey brought various claims relating to the interpretation and

enforcement of the March 2017 Mortgage and the Settlement Agreement (e.g., breach of contract, breach of the implied covenant, reformation, and declaratory relief).[10]  While we have found its claims to be without merit, the Settlement Agreement did not prohibit Adams & Bailey from bringing these claims and it did not contain a release of claims.  *See Kendrick*, ¶ 18, 15 P.3d at 740 ("A release discharges another from an existing or asserted . . . claim . . . , and it bars recovery thereon." (quoting *M & A Constr.*, 936 P.2d at 456)); 66 Am. Jur. 2d *Release* § 1 ("[A] release is a discharge of a claim or obligation and a surrender of a claimant's right to prosecute a cause of action.").  Additionally, the Agreement provides: "In the event of a material breach under this Agreement, the prevailing Party in any action commenced to enforce this Agreement shall be awarded its reasonable attorneys' fees and court costs against the non-prevailing Party."  The parties clearly anticipated that a party could bring an action to enforce the Settlement Agreement and that such action in and of itself would not constitute a breach of the Agreement.

## V.     Did the district court err by awarding the Banks their attorney fees and costs?

[¶77]  The district court determined Adams & Bailey's breached the Settlement Agreement by bringing this action, that this breach was material, and the Banks were entitled to their attorney fees and costs under Section 21 of the Agreement, which states:

> The Parties agree that each shall be responsible for payment of its own attorneys' fees and court costs incurred in connection with this matter including, but not limited to, those incurred in connection with the negotiation, drafting and execution of this Agreement.  ***In the event of a material breach under this Agreement, the prevailing Party in any action commenced to enforce this Agreement shall be awarded its reasonable attorneys' fees and court costs against the non-prevailing Party.***

(Emphasis added.)  The Banks filed a motion for their attorney fees and costs, requesting $176,694.25 in fees and $24,268.94 in costs, for a total of $200,963.19.  The district court granted the motion.

[¶78]  The Adams Family Parties argue the district court erred by awarding the Banks their attorney fees and costs.  Relevant here, they argue that if we reverse the grant of summary judgment to the Banks on the counterclaims, the court's award of fees and costs must also be reversed.

---

[10] Adams & Bailey attempted to bring its arguments in the bankruptcy court when it objected to ANB's motion to enforce the Settlement Agreement, but the bankruptcy court declined to rule on them because they did not affect the bankruptcy estate.

[¶79] "Generally, Wyoming subscribes to the American rule regarding recovery of attorney fees, making each party responsible for its own attorney fees, unless an award of fees is permitted by contract or statute." *Thorkildsen v. Belden*, 2011 WY 26, ¶ 11, 247 P.3d 60, 63 (Wyo. 2011) (citing *Garwood v. Garwood*, 2010 WY 91, ¶ 32, 233 P.3d 977, 984 (Wyo. 2010)). In this case, the district court granted summary judgment to the Banks on the counterclaims and awarded fees and costs under the Settlement Agreement based solely on its determination that Adams & Bailey had breached the Agreement by filing this lawsuit. Because we conclude that filing this lawsuit did not constitute a material breach— or any breach—of the Agreement, the district court's determination that Adams & Bailey breached the Agreement was in error, and the district court's award of fees and costs was in error.[11]

## CONCLUSION

[¶80] We affirm the district court's dismissal and summary judgment orders with respect to the Adams Family Parties' claims. We reverse the district court's grant of summary judgment to the Banks on the counterclaims and its attorney fees and costs award.

---

[11] The Banks did not argue in the district court that they were entitled to their attorney fees and costs under the Settlement Agreement because they were "the prevailing party" with respect to the Adams Family Parties' claim that they breached the Settlement Agreement. They sought attorney fees and costs solely on the basis that Adams & Bailey materially breached the Settlement Agreement by filing this lawsuit and that was the ground upon which the district court awarded them fees and costs. Similarly, while the Banks suggest in their brief that the Second Position Residential Mortgage provides another basis to award fees because it contains a provision allowing CMR to collect attorney fees and costs if CMR is required to take action to protect its contractual rights, this mortgage was not the basis for the district court's fees and costs award, and neither the Adams Family Parties nor the Banks raised any claims with respect to this mortgage.